**Feliberto RIVERA, Jr., Plaintiff,**

v.

**Glenn S. GOORD, Commissioner of the New York State Department of Correctional Services, et al., Defendants.**

**No. 99 Civ. 1683(DC).**

United States District Court,
S.D. New York.

Sept. 26, 2000.

330

Nizar A. Abdullah, Jersey City, NJ, for Plaintiff.

Eliot Spitzer, Attorney General of the State of New York by Susan H. Odessky, Assistant Attorney General, New York City, for the New York State Defendants.

Drake, Sommers, Loeb, Tarshis & Catania, P.C. by Daniel J. Schneider, One Corwin Court, Newburgh, NY, for Defendants.

## *OPINION*

CHIN, District Judge.

Plaintiff Feliberto Rivera, Jr. brings this prisoner civil rights action pursuant to 42 U.S.C. §§ 1983, 1985, and 1986, alleging that various officials and employees of the New York State Department of Correctional Services ("DOCS"), as well as the St. Francis Medical Center, violated his rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. Rivera's claims arise from a dental procedure performed on him in prison in 1997; he claims that after the procedure, various defendants exhibited deliberate indifference to his worsening physical condition and medical needs, while other defendants retaliated against him because he complained about the medical care he was receiving. Rivera seeks compensatory and punitive damages. Defendants move to dismiss the amended complaint pursuant to Fed. R.Civ.P. 12(b)(6) on the grounds that (1) defendants are immune from suit; (2) cer-

tain of the defendants were not personally involved in the alleged violations; (3) plaintiff fails to state a claim upon which relief can be granted; and (4) defendants are entitled to qualified immunity. For the reasons that follow, the motion is granted in part and denied in part.

## BACKGROUND

Plaintiff's claims against the forty-two defendants arise out of incidents occurring during two different time periods, from April 1996 to December 1997 and from April to July 1999, while he was incarcerated at Green Haven Correctional Facility ("Green Haven"). The facts as set forth below summarize Rivera's seventy-three page *pro se* amended complaint.

### A. 1996–1997

Rivera's dental problems date back to April 30, 1996, when he first reported to sick call complaining of pain in his mouth. Dr. Stolfi and Dr. Licerio diagnosed an impacted wisdom tooth and told Rivera that the tooth would have to be extracted. Rivera was soon transferred to another correctional facility and remained there for the next seven months. When he was transferred back to Green Haven, he was examined again in January 1997, this time by Dr. Kerschenbaum, who concurred in the earlier diagnosis and recommended extraction of the impacted tooth.

The parties disagree as to what surgical procedure plaintiff agreed to undergo. Rivera contends that at an appointment with Dr. Fratalone, an oral surgeon, on February 19, 1997, he consented to the removal of his wisdom tooth, and underwent surgery believing that his tooth was being extracted. Two weeks later, Rivera discovered that Dr. Fratalone did not remove his tooth, but only removed a piece of tissue from his mouth; plaintiff claims

that he never consented to this "plastic surgery." Defendants agree that Dr. Fratalone removed a piece of tissue from Rivera's gums, but contend that this was precisely the procedure to which plaintiff had consented. For purposes of this motion, I accept plaintiff's version of the facts.

Plaintiff visited sick-call four times during the three days after the surgery, complaining of facial swelling and increasing pain. He was given prescription pain medication and antibiotics, and told to use hot compresses on his face. When the swelling and pain did not abate, Rivera was sent to the emergency room at St. Francis Medical Center ("St.Francis"). On February 24, 1997, plaintiff underwent an unspecified operation at St. Francis. He remained at the medical center for six days, receiving treatment and various tests, before he was discharged and returned to Green Haven on March 1, 1997.

Rivera's pain and facial swelling continued over the course of the next ten months, and during this period he also suffered from migraine headaches, infections, severe burning in his eyes, impaired vision, and partial loss of hearing; he states that he was eventually diagnosed with a temporomandibular disorder ("TMD"), a condition that affects the temporomandibular (or jaw) joint. Rivera claims that his medical problems were caused by Dr. Fratalone during the initial dental surgery on February 19. Plaintiff further alleges that his physical maladies were exacerbated by the failure of various defendants on the Green Haven medical staff (the "Medical Defendants"[1]) to provide him with proper medical care after the two operations; Rivera contends that the Medical Defendants and other Green Haven medical employees ignored his repeated pleas for medical care and refused to provide him with the treatment he required.

---

1. The Medical Defendants are Dr. Norman H. Selwin, Facility Health Services Director for Green Haven; Donald Stevens, Nurse Administrator for Green Haven; Dr. John Fratalone, Oral Surgeon for Green Haven; Dr. Eduardo

J. Licerio, Dental Director for Green Haven; Dr. William Stolfi and Dr. Philip Kerschenbaum, Dentists; Doctors Lester Silver, Sohng, and Harry Mamis; Dental Assistant Nancy Cortes; and Nurse Patricia A. Pecenco.

For example, Rivera states that on March 3, 1997, days after he returned to Green Haven from St. Francis, he asked Dr. Selwin to change his intravenous ("IV") line because it was causing pain and bruising; the doctors at St. Francis had told plaintiff to change the IV line if he experienced such symptoms. According to Rivera, Selwin refused to change the IV line because Green Haven did not have any replacement IV lines, and Rivera ultimately pulled out the line himself. (Compl., ¶ 19). On another occasion, Dr. Silver refused to see Rivera for a scheduled appointment, stating "I refused to see you on your last appointment and I don't want to see you now. I cannot do anything for your chronic medical condition." (Compl., ¶ 58). Rivera also lists several other occasions on which he went to sick-call complaining of various symptoms and the Medical Defendants simply refused to see or treat him. (See, e.g., id., ¶¶ 21, 29, 44, 69, 73, 85).

On the other hand, plaintiff's complaint also details the extensive medical care he *did* receive from the Medical Defendants and the rest of Green Haven's medical staff. In 1997, Rivera was examined at least thirty times by 21 different doctors, including two oral surgeons, at least two dentists, a radiologist, an opthalmologist, an audiologist, and an ear, nose, and throat specialist. Plaintiff was sent to three outside facilities—St. Francis, Mid–Hudson Radiology, and St. Agnes Hospital—for medical treatment. Finally, Rivera states that on numerous visits to sick-call, the Medical Defendants and other staff members listened to his complaints and provided him with medical treatment, including prescribing medications for his pain, infections, and eye and ear problems and performing x-rays and an HIV test.

Plaintiff also alleges that he was harassed and intimidated by various Green Haven corrections officers (the "Correctional Defendants"[2]) during the ten months following his second surgery, from March to December of 1997. He contends that certain of the Correctional Defendants harassed and intimidated him in retaliation for the numerous complaints he had filed (and continued to file) against Green Haven's medical staff. (*See* Compl., ¶¶ 45, 61, 63, 79, 86, 88).

Rivera also alleges that several of the Correctional Defendants physically assaulted him in retaliation for the complaints he filed. On September 11, 1997, plaintiff states that he was removed from the clinic by Kelly, Brady, Brenda Schneider, Belton, and other officers; as Rivera was walking, Kelly told him that he was "sick of [Rivera] writing complaints" and that if Rivera turned around, Kelly would "kick his ass." Kelly, Belton, and Brady then pinned Rivera against a wall, banging his face into the wall and twisting his arms behind him, while Colatosti and Schneider looked on without coming to plaintiff's aid. (*Id.*, ¶ 71).

The amended complaint lists other alleged acts of harassment and intimidation by the Correctional Defendants (*see, e.g.*, Compl., ¶¶ 61, 63, 65, 79, 86, 88). Rivera further contends that from March to December 1997, certain of the Correctional Defendants acted to deny him medical care, by refusing to take him to sick-call when he requested medical attention. (*See id.*, ¶¶ 54, 82, 84)

Finally, during the same time period, plaintiff alleges that he told various supervisors at Green Haven and officials at the New York State Department of Corrections (the "Official/Supervisory Defen-

---

**2.** The Correctional Defendants are Correctional Sergeants Alexander C. Miller, William F. Keyser, Keith Schmitt, Richard A. Ward, John J. Tierney, and Nicolasa Patterson; Correctional Officers Jerry W. Surber, Alfred J. DiTommaso, Michael E. Frazier, William E. Kelly, Andrew M. Belton, Patrick M. Brady,

Susan Colatosti, Brenda L. Schneider, G. Mitchetti, R. Meyer, D. Daly, and Franklin W. Middleton; Lieutenants Michael N. Nagy, Gwen S. Schneider, and Thomas K. Quackenbush; Senior Correction Counselor Virginia Blaetz; and Captain William J. Totton.

dants"[3]) about the conduct of the Medical and Correctional Defendants, asking for their assistance. Rivera states that his written complaints either went unanswered or were summarily dismissed. (*See, e.g.,* Compl., ¶¶ 46, 50, 61–63, 66, 71, 79, 84, 87).

## B. *1999*

### 1. *The Instant Proceedings*

Plaintiff filed this action *pro se* on March 5, 1999. By letter dated May 20, 1999, Rivera agreed to withdraw his claims against nine defendants named in his original complaint. (*See* 5/28/99 Order). By motion dated June 17, 1999, plaintiff requested permission to file a "supplemental complaint" alleging constitutional violations similar in nature to those alleged in his original complaint that occurred *after* the filing of that initial pleading in March 1999 and to reinstate his claims against Brenda Schneider; the supplemental complaint was attached to the notice of motion, and contained allegations only about conduct that occurred after March 1999. (*See* Notice of Motion for Leave to File Supp. Compl.). By memo endorsement dated July 2, 1999, I granted Rivera's motion, but because it was attached to the notice of motion, the supplemental complaint was never docketed separately as part of the record.

Plaintiff thereafter requested leave to file an amended complaint and the defendants consented. Consequently, I granted the request. The amended complaint essentially combined the original and supplemental complaints, and included factual allegations about the events occurring in both 1997 and 1999. (*See* Memo Endorsement on Attorney General's 6/26/99 Letter to the Court). The amended complaint, which was filed on July 22, 1999, added twelve new defendants to the case.

### 2. *1999 Events at Green Haven*

Plaintiff contends that in 1999, certain of the Correctional Defendants harassed and threatened him in retaliation for filing the instant action against them.

For example, Rivera alleges that on several occasions, he was denied access to mental health appointments, religious activities, and the law library when various Correctional Defendants refused to give him "call-outs" to visit these facilities. (*See* Am. Compl., ¶ 91, 96). The complaint purports to list other incidents of harassment and threats. (*Id.*, ¶¶ 93, 94, 98).

Rivera also complains of two false reports filed against him in 1999. He contends that on April 26, 1999, Daly and Meyer filed a false inmate misbehavior report charging him with lying about a work assignment, in retaliation for his lawsuit. (*See id.*, ¶¶ 95, 97). At the subsequent Tier II hearing, plaintiff was initially found not guilty of the charges, but Gwen Schneider, the officer who presided at the hearing, later changed the disposition to guilty, resulting in Rivera being confined to his cell for three days; Rivera implies Gwen Schneider was biased against him because her husband, George Schneider, her niece, Brenda Schneider, and her niece's husband, Jerry Surber, were defendants in plaintiff's suit. (*See id.*, ¶ 97).

Rivera also alleges that Mitchetti filed a false report against him on July 3, 1999, charging him with four inmate offenses; he claims that he was deprived of due process when Nagy, already named as a defendant in the instant case, presided at the subsequent hearing, over Rivera's objections. (*See id.*, ¶ 100, 102). Rivera further claims that Nagy deliberately ad-

---

**3.** The Official/Supervisory Defendants are Glenn S. Goord, Commissioner of the New York State Department of Corrections; Christopher P. Artuz, Superintendent of Green Haven; Larry Zwillinger, Regional Health Services Administrator for Green Haven; L. Klein, Mental Health Unit Chief; McCoy, Deputy Superintendent of Programs; Dennis Bliden, First Deputy Superintendent; and Deputy Superintendent of Security George S. Schneider.

journed the hearing and delayed in reconvening the proceeding to keep plaintiff confined to his cell, as he had been since the filing of the report. (*See* ¶¶ 104–05). When the hearing was reconvened, Rivera was found guilty of two charges, and was sentenced to 30 days keep-lock and the loss of certain privileges. (*See id.,* ¶ 106).

Rivera further alleges that certain of the Official/Supervisory Defendants permitted the Correctional Defendants' actions by failing to take action against them. He filed a complaint with Artuz and Goord, detailing the alleged campaign of harassment waged against him by Brenda Schneider, Surber, and Surber's "gang of officers," and accusing Artuz and Goord of continuing to "encourage, tolerate, ... permit[ ] and ratify[ ]" the officers' behavior because they were related to certain Official/Supervisory Defendants, namely George Schneider and Bliden. (Am. Compl., ¶ 98). He later wrote to McCoy and Bliden, informing them of the alleged retaliatory behavior of certain Correctional Defendants, citing the false report filed by Mitchetti and the hearing conducted by a biased Nagy. (*Id.,* ¶ 102). Plaintiff does not allege that any of these defendants received his complaints or learned about the alleged constitutional violations from any other source.

Finally, plaintiff alleges that Dr. Selwin continued to neglect his medical needs in 1999, refusing to see Rivera on five different occasions in May and June. (*See* Am. Compl., ¶ 99).

### DISCUSSION

In reviewing a motion to dismiss, I must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). A complaint may not be dismissed under Rule 12(b)(6) unless it " 'appears beyond doubt that the plaintiff can

prove no set of facts in support of his claim which would entitle him to relief.' " *Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Therefore, the issue before the Court " 'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 235–36, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)), *cert. denied,* 519 U.S. 808, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996). Moreover, the allegations of a *pro se* complaint [4] are held to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

### I. Section 1983 Claims

■ To state a claim under 42 U.S.C. § 1983, a plaintiff must show that: (1) the defendants acted under "color of state law"; and (2) their conduct or actions deprived plaintiff of a right, privilege, or immunity guaranteed by the Constitution or laws of the United States. *Shabazz v. Vacco,* No. 97 Civ. 3761(DC), 1998 WL 901737, at *2 (S.D.N.Y. Dec. 28, 1998) (citing *Pitchell v. Callan,* 13 F.3d 545, 547–48 (2d Cir.1994)).

To withstand a motion to dismiss, a § 1983 complaint must contain specific allegations of fact indicating a deprivation of constitutional rights. *See id.* In assessing a prisoner's claims under § 1983, the court "will dismiss a complaint that 'consist[s] of nothing more than naked assertions, and set[s] forth no facts upon which a court could find a [constitutional] violation.' " *Mitchell v. Keane,* 974 F.Supp. 332, 338 (S.D.N.Y.1997) (quoting *Martin v. New York State Dep't of Mental Hygiene,* 588 F.2d 371, 372 (2d Cir.1978)); *see also Alfa-*

4. Although Rivera is now represented by counsel, he is proceeding on his *pro se* amended complaint.

**336**

*ro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987) (broad, simple, and conclusory statements do not state a claim under § 1983). Because plaintiff is proceeding on his *pro se* amended complaint, I am required to liberally construe plaintiff's pro se papers " 'to raise the strongest arguments that they suggest.' " *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)).

For ease of discussion, the defendants are divided into four groups: St. Francis, the Medical Defendants, the Correctional Defendants, and the Official/Supervisory Defendants. I will discuss the allegations against each group of defendants in turn below.

 As an initial matter, however, I note that plaintiff's claims for monetary damages against the Medical Defendants, the Correctional Defendants, and the Official/Supervisory Defendants in their official capacities are prohibited under the Eleventh Amendment. Absent a state's consent to suit or express statutory abrogation, the Eleventh Amendment bars suits brought in federal court against a state by the state's own citizens. *See Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). New York has not consented to suit in federal court, *see Trotman v. Palisades Interstate Park Comm'n,* 557 F.2d 35, 38–40 (2d Cir.1977), nor does § 1983 abrogate a state's immunity from suit, *see Quern v. Jordan,* 440 U.S. 332, 343–45, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979), and therefore New York cannot be sued in federal court under § 1983. Because state agencies are entitled to assert the state's Eleventh Amendment immunity, *see Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), defendant Green Haven, a branch of DOCS, a New York state agency, is therefore immune from suit.

 State employees sued in their official capacities are also immune from suits for monetary damages under the Eleventh Amendment when the state is the real party in interest. *See Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir. 1989). Here, all of the defendants except St. Francis and Green Haven are employees of DOCS, and are therefore immune from suit in their official capacities under the Eleventh Amendment. Moreover, "[s]tates—and state officers, if sued in their official capacities for retrospective relief—. . . are not 'persons' subject to suit under § 1983." *K&A Radiologic Tech. Services, Inc. v. Commissioner of Dep't of Health,* 189 F.3d 273, 278 (2d Cir.1999) (citations omitted). Accordingly, the claims against the defendants in their official capacities are hereby dismissed.

### A. St. Francis

Plaintiff fails to state a claim against St. Francis. Only three of the 130 paragraphs in the amended complaint discuss St. Francis in any detail, and those paragraphs are devoid of any allegations of wrongdoing. (*See* Am. Compl., ¶¶ 16–18). The claims against St. Francis are dismissed.

### B. Medical Defendants

Plaintiff alleges that the Medical Defendants' failure to treat the severe pain, swelling, migraine headaches, and other TMD symptoms he suffered after the dental surgery constituted deliberate indifference to his medical needs in violation of the Eighth Amendment.

 The Eighth Amendment prohibits the infliction of "cruel and usual punishment" on those convicted of crimes. U.S. Const. amend. VIII. To establish an Eighth Amendment claim arising out of denial of medical care, a prisoner must prove "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The deliberate indifference standard includes both a subjective and an

objective element. *See Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir.1994), *cert. denied*, 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995).

■■■ First, the alleged deprivation of care must be "sufficiently serious" in objective terms. *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). In the Second Circuit, "[a] serious medical condition exists where 'the failure to treat a prisoner's condition could result in ... the unnecessary and wanton infliction of pain.'" *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir.2000) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.1998)). With regard to dental conditions, the Second Circuit has observed that "dental conditions (like other medical conditions) vary in severity and ... a decision to leave a condition untreated will be constitutional or not depending on the facts of the particular case." *Id.* at 136–37.

■■■ Second, "the charged official must act with a sufficiently culpable state of mind." *Hathaway*, 37 F.3d at 66 (citing *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). The required culpability is something "more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Id.* The plaintiff must allege that an official " 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

■■■ Accepting the truth of plaintiff's allegations for purposes of this motion, as I must, I cannot conclude that plaintiff can prove no set of facts sufficient to meet the deliberate indifference standard with respect to defendants Selwin, Fratalone, Kershenbaum, Silver, Sohng, Mamis, and Pecenco. Rivera alleges that the depriva-tion of care was "sufficiently severe," asserting that he suffered "severe," "unbearable," and "great" pain because the defendants refused to provide him with pain medication. He further alleges that he was later diagnosed with TMD, a painful jaw disorder marked by symptoms such as pain, headaches, earaches, and hearing problems, symptoms of which Rivera complained to the Medical Defendants. *See* National Institute of Dental & Craniofacial Research/National Institutes of Health, *Temporomandibular Disorders* (last modified Aug. 23, 2000), <http://www.nidcr.nih.gov /news/ publica.htm>. These allegations are sufficient to satisfy the first prong of the deliberate indifference standard. *See Chance v. Armstrong*, 143 F.3d 698, 702–03 (2d Cir.1998) (allegations of continuous "great pain" and inability to chew properly sufficient to withstand motion to dismiss).

Plaintiff also satisfies the second prong of the test with respect to these defendants, alleging that each defendant knew of and disregarded an excessive risk to his health. (*See, e.g.*, Am. Compl., ¶¶ 19, 21, 28, 36, 41, 56, 58, 69, 80). Indeed, plaintiff has alleged that he received a specific diagnosis of TMD from an outside medical specialist, who prescribed a course of treatment, including a special diet and future visits to an oral surgeon, but that this course of treatment was not followed by these defendants. (*Id.*, ¶¶ 39, 41). These allegations are sufficient to state a claim for deliberate indifference. *See Dean v. Coughlin*, 623 F.Supp. 392, 403–04 (S.D.N.Y.1985) ("Even if prison officials give inmates access to treatment, they may still be deliberately indifferent to inmates' needs if they fail to provide prescribed treatment.").

Of course, the fact that Rivera was examined numerous times· and received numerous prescribed pain medications over the course of 1997 casts doubt on plaintiff's ability to prove that the defendants knowingly disregarded an excessive risk to his health. At this early stage, however, I

cannot say that plaintiff fails to allege sufficiently serious injury, nor can I reject his claim that defendants acted with a culpable state of mind in failing to treat his pain. For example, while Selwin gave Rivera pain medication on October 14, 1997, Rivera alleges that he had been suffering from pain and asking for such medication for more than a month. (Am.Compl., ¶ 89). *See Hemmings v. Gorczyk*, 134 F.3d 104, 108–09 (2d Cir.1998) ("While we agree that the fact that plaintiff received some medical attention ... substantially weakens his claim of deliberate indifference, we are not prepared to say that his claim is so completely devoid of merit as to justify dismissal at this early stage."); *Hathaway*, 37 F.3d at 68 (when plaintiff repeatedly complained of severe pain, defendant doctor's frequent examinations of plaintiff did not preclude finding of deliberate indifference, because "[a] jury could infer deliberate indifference from the fact that [defendant] knew the extent of [plaintiff]'s pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [plaintiff]'s situation").

Fratalone contends that Rivera fails to state a claim against him because Rivera's allegations amount to nothing more than a disagreement with Fratalone's medical judgment about the proper course of treatment for Rivera, a claim that at most alleges medical malpractice. While "the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation" and "negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim," *Chance*, 143 F.3d at 703, the Second Circuit has held that "certain instances of medical malpractice may rise to the level of deliberate indifference; namely, when the malpractice involves culpable negligence, i.e., an act or failure to act by the prison doctor that evinces a 'conscious disregard of a substantial risk of serious harm.'" *Hathaway*, 99 F.3d at 553. Here, plaintiff alleges that Fratalone diagnosed an impacted wisdom tooth, rec-

ommended surgery to extract that tooth, and actually began operating without anyone taking any x-rays of Rivera's mouth, stopping midway through the surgery to take an x-ray. (Am.Compl., ¶¶ 7–11). These allegations are sufficient to plead an act evincing a conscious disregard of a substantial risk of serious harm. If these allegations are true, Fratalone arguably acted with conscious disregard of a substantial risk of serious harm by recklessly starting an operation without first taking an x-ray. The fact that he took an x-ray midway through the procedure (assuming this is true) is arguably an acknowledgment that he should have taken the x-ray earlier.

■ Plaintiff fails to state an Eighth Amendment deliberate indifference claim against the remaining Medical Defendants, however, and thus this claim is dismissed as to Licerio, Stolfi, Cortes, and Stevens. None of these defendants exhibited deliberate indifference to Rivera's medical needs; indeed, by plaintiff's own pleading, Licerio, Stolfi, and Cortes either provided Rivera with the medical care he requested or were never asked to provide any specific medical assistance. (*See, e.g.,* Am. Compl., ¶¶ 13, 23, 26, 27, 32).

■ Stevens is mentioned only once in the complaint. Rivera alleges that when Dr. Sohng refused to see him on one occasion, he went to Stevens and "explained the situation to him and everything he had been going through since he left [St. Francis]"; Stevens told Rivera that he had "no choice but to see Dr. Sohng." (Am. Compl., ¶ 36). These allegations fail to state a deliberate indifference claim against Stevens. First, because it is unclear what Rivera told Stevens about his condition, Stevens may not have even known that Rivera was experiencing any pain or had any particular medical need at that time. Second, even assuming that Stevens knew that Rivera had a sufficiently serious medical condition, he did not act with the requisite culpability. Stevens was

only the Nurse Administrator and there was little that he could do but refer plaintiff to Dr. Sohng, the doctor on duty at the time. Stevens certainly did not violate Rivera's rights by referring him to the doctor.

To summarize, I hold that Rivera may proceed on his Eighth Amendment deliberate indifference claim against defendants Selwin, Fratalone, Kershenbaum, Silver, Sohng, Mamis, and Pecenco. This claim is dismissed as to Licerio, Stolfi, Cortes, and Stevens.

## C. *Correctional Defendants*

Before discussing plaintiff's claims against the Correctional Defendants in detail, I note that the allegations against defendants Miller, Schmitt, Ward, Tierney, Frazier, Quackenbush, and Totten cannot be construed to state any sort of constitutional claim under § 1983, even under the most liberal, expansive reading possible. (*See* Am. Compl., ¶¶ 20, 54, 63, 64, 65, 88, 94, 101, & 103). For example, the only conduct of which Schmitt is accused is searching a bathroom before Rivera entered it. (*See* Am. Compl., ¶ 88). The allegations against the other defendants listed above are equally without merit. Accordingly, plaintiff's claims against these defendants are dismissed.

### 1. *Retaliation*

The amended complaint can be read to allege a retaliation claim against certain of the Correctional Defendants. Rivera alleges that in retaliation for his filing prison grievances and the instant lawsuit against various prison officials, correctional officers, and members of the medical staff: (1) Keyser, Surber, Kelly, Colatosti, Meyer, Middleton, and Nagy verbally harassed him; (2) Surber, Kelly, Belton, and Brady physically assaulted him or attempted to do so; (3) Mitchetti, Meyer, and Daly filed false misbehavior reports against him; (4) Gwen Schneider adjudged Rivera guilty at a disciplinary hearing; (5) Nagy lied at a disciplinary hearing in August 1997, resulting in Rivera being found guilty and sentenced to 90 days confinement and loss of privileges; and (6) Nagy deliberately adjourned a disciplinary hearing in July 1999 to continue Rivera's detention in pre-hearing keeplock confinement.

It is well-established that prison officials may not retaliate against inmates for exercising their constitutional rights. *See, e.g., Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988). To state a retaliation claim under § 1983, "a plaintiff must show that: (1) his actions were protected by the Constitution or federal law; and (2) the defendant's conduct complained of was in response to that protected activity." *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000) (internal quotation and citation omitted). As to the second prong, a prisoner alleging retaliation must show that the protected conduct was "a substantial or motivating factor" behind the alleged retaliatory conduct. *See Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Evidence that can lead to an inference of improper motive includes: (1) the temporal proximity of the filing of a grievance and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant regarding his motive for disciplining plaintiff. *See Colon,* 58 F.3d at 872–73.

Because claims of retaliation are easily fabricated, the courts must "examine prisoners' claims of retaliation with skepticism and particular care," *id.* at 872, requiring " 'detailed fact pleading ... to withstand a motion to dismiss.' " *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (quoting *Angola v. Civiletti,* 666 F.2d 1, 4 (2d Cir. 1981)). To survive a motion to dismiss, such claims must be " 'supported by specific and detailed factual allegations,' " and not stated " 'in wholly conclusory terms.' " *Friedl,* 210 F.3d at 85–86 (quoting *Flaherty,* 713 F.2d at 13); *see also Graham,* 89 F.3d at 79 (wholly conclusory claims of retaliation "can be dismissed on the plead-

ings alone"); *Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir.1987) (same).

■ Moreover, only those retaliatory acts that are likely to "chill a person of ordinary firmness from continuing to engage" in activity protected by the First Amendment are actionable under § 1983; in other words, allegations of *de minimis* acts of retaliation do not state a claim under § 1983. *Thaddeus–X v. Blatter*, 175 F.3d 378, 397 (6th Cir.1999) *cited with approval in Davidson v. Chestnut*, 193 F.3d 144, 150 (2d Cir.1999); *accord Crawford–El v. Britton*, 93 F.3d 813, 826 (D.C.Cir.1996) (en banc), *vacated on other grounds*, 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *Wells v. Wade*, 96 Civ. 1627(SHS), 2000 WL 1239085, at *4 (S.D.N.Y. Aug. 31, 2000); *see also Worrell v. Henry*, 219 F.3d 1197, 1213 (10th Cir. 2000); *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir.2000); *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir.1982); *cf. Davidson*, 193 F.3d at 150 (on remand, district court to consider the "serious question" of "whether the alleged acts of retaliation … were more than de minimis" in deciding summary judgment motion).

■ Applying these standards, Rivera states a retaliation claim against defendants Kelly, Belton, Brady, Meyer, and Nagy. First, Rivera's conduct—the filing of grievances and this lawsuit against various prison officials—was protected by the First and Fourteenth Amendments. Second, Rivera has alleged with sufficient particularity that this protected conduct was a substantial or motivating factor behind the defendants' actions. Finally, the alleged acts of retaliation by these defendants were not *de minimis* and would chill a person of ordinary firmness from continuing to engage in his First Amendment

activity. (*See, e.g.*, Am. Compl., ¶¶ 63, 65, 71, 86, 93, 95, 97, 102–04).

■ With respect to the remaining defendants accused of retaliation—namely, Surber, Keyser, Middleton, Mitchetti, Daly, and Colatosti—Rivera fails to state a claim under § 1983. Rivera either fails to sufficiently allege that his protected conduct was a substantial or motivating factor behind these defendants' actions towards him or, if he does sufficiently allege causation, the acts he complains of are *de minimis* and would not chill a person of ordinary firmness from exercising his First Amendment rights.

For example, Surber's alleged acts of retaliation occurred *before* Rivera filed any grievances against him or the medical staff; the alleged retaliation occurred on May 21 and July 15, 1997, but Rivera did not file a grievance against Surber until July 23, 1997, nor did he file a grievance against any medical personnel until September 15, 1997.[5] (Am.Compl., ¶¶ 45, 61, 62, 73). Moreover, even if the retaliatory acts had followed the filing of grievances, the acts complained of were *de minimis*, and thus not actionable. (*See id.*, ¶¶ 45, 61).

Similarly, even though Rivera has alleged that the actions of Keyser and Middleton were motivated by Rivera's filing of grievances, the alleged acts of retaliation, even if assumed to be true, are *de minimis*; Rivera states only that Keyser and Middleton "shoved" him while taking him to the "box" (i.e., Green Haven's Special Housing Unit, or "SHU"). (*See id.*, ¶ 63). Such actions, even if proven at trial, would not chill a person of ordinary firmness from continuing to engage in First Amendment activity.

With respect to Mitchetti and Daly, Rivera fails to allege that their actions were

---

**5.** Plaintiff mentions in passing that on April 7, 1997, he "was called to a grievance hearing … for the complaint that he filed on the Medical Department" (Am.Compl., ¶ 31), but the amended complaint contains no allegations prior to this about any grievance filed by Rivera against the medical staff. Paragraph 31 of the amended complaint gives no details about this grievance, such as the date it was filed or the subject of the grievance, nor does it list any of the details of the hearing allegedly held on April 7.

motivated by his exercise of his First Amendment rights in filing the instant case. He characterizes Mitchetti's filing of an allegedly false misbehavior report as "retaliatory," but does not plead any facts that would give rise to such an inference. There was no temporal proximity between plaintiff's protected activity and Mitchetti's alleged acts of retaliation; Mitchetti filed his false report on July 3, four months after plaintiff filed this case. At that time, Mitchetti was not a defendant in this case, and plaintiff does not allege that Mitchetti was retaliating against him because Rivera had sued other Green Haven correctional officers, nor does plaintiff point to any statements made by Mitchetti that would indicate a retaliatory motive. (*See* Am. Compl., ¶¶ 100, 102). Plaintiff fails to state a claim against Daly for similar reasons; although Daly's filing of an allegedly false report followed soon after plaintiff's filing of this case, there is nothing else in the amended complaint that leads to an inference of retaliation by Daly. (*See id.,* ¶¶ 93–95).

Finally, Rivera's allegations against Colatosti and Gwen Schneider are too vague to support a retaliation claim. He claims that Colatosti "harassed [him] about the complaint he filed against her" two weeks earlier, but he does not specify what she did to harass him. (Am.Compl., ¶ 79). Rivera alleges that at a disciplinary hearing in April 1999, Gwen Schneider, a relative by blood or marriage to several of the other defendants in this suit, found him guilty of lying to an officer and sentenced him to three days confinement to his cell, but he does not state that there was any retaliatory motive behind her decision. (Am.Compl., ¶ 97).

To summarize, Rivera may proceed on his First Amendment retaliation claim against defendants Kelly, Belton, Brady, Meyer, and Nagy. The retaliation claim is dismissed with respect to defendants Surber, Keyser, Middleton, Mitchetti, Daly, Colatosti and Gwen Schneider.

### 2. *Excessive Force*

The amended complaint arguably can be read to allege an Eighth Amendment excessive force claim against defendants Kelly, Belton, and Brady for the same alleged physical assault that was the basis of Rivera's retaliation claim, and against Surber, Colatosti, and Brenda Schneider for other physical contact with plaintiff.

The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners from the "unnecessary and wanton infliction of pain" by prison guards. *Boddie v. Schnieder,* 105 F.3d 857, 861 (2d Cir.1997) (internal quotation and citation omitted). The inquiry into an Eighth Amendment claim has both an objective and a subjective prong. *See id.*

Objectively, the plaintiff must show that the alleged use of force is grave or harmful enough to be actionable. Only the use of physical force that is "repugnant to the conscience of mankind" amounts to a constitutional violation, *Whitley v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *de minimis* uses of physical force generally do not suffice to state a constitutional claim. *Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). Indeed, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

Subjectively, the plaintiff must then show that the prison guards acted wantonly, with the sadistic or malicious intent to harm him. *See Hudson,* 503 U.S. at 7, 112 S.Ct. 995; *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993). The "wantonness" inquiry turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," *Hudson,* 503 U.S. at 7, 112 S.Ct. 995; factors relevant to this inquiry include "the need for application of force, the relation-

ship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Id.* (internal quotations and citation omitted).

■ Applying these standards to the alleged conduct of Kelly, Belton, and Brady, Rivera's allegations of excessive force—that the defendants pinned him against a wall, face-first, twisted his arms behind his back, and banged his face against the wall—are sufficient to state an excessive force claim. While the amended complaint lacks detail as to the extent of the injuries Rivera suffered, he alleges that he "was in so much pain ... from them banging his face against the wall." (Am.Compl., ¶ 71). Moreover, the alleged assault occurred just hours after Rivera had gone to the clinic complaining of severe facial pain; the alleged injury to an already painful and sensitive area, if proven at trial to be sufficiently serious, could reach a constitutional level.

Rivera has also alleged facts from which an inference of wantonness can be inferred. According to the amended complaint, there was no act or threatened act by Rivera that precipitated the alleged assault; Kelly, Belton, and Brady led plaintiff out of the clinic and into a hallway, where they proceeded to assault him. Under the circumstances as alleged, the officers did not apply force to Rivera "to maintain or restore discipline," for Rivera posed neither a disciplinary problem nor a threat to the officers. Furthermore, because the officers removed plaintiff from the clinic, where he was awaiting medical care, to assault him in a hallway, one could infer that "force was applied to maliciously and sadistically cause harm." Accordingly, plaintiff may proceed with his Eighth Amendment excessive force claim against Kelly, Belton, and Brady.

■ To the extent that the amended complaint can be read to assert excessive force claims against defendants Surber, Colatosti, and Brenda Schneider, however, these claims are dismissed. The force that these defendants allegedly applied against Rivera—"aggressive pat frisks" of Rivera by Surber and Colatosti (*see* Am. Compl., ¶¶ 45, 88), an attempt to hit Rivera by Surber (*see id.,* ¶ 61), and "pushing and grabbing" of Rivera by Brenda Schneider (*see id.,* ¶ 71)—does not arise to a constitutional claim, under the standards set forth above.

To summarize, Rivera may proceed on his Eighth Amendment excessive force claim against defendants Kelly, Belton, and Brady. The excessive force claim is dismissed with respect to defendants Surber, Colatosti and Brenda Schneider.

### 3. *Verbal Harassment*

■ To the extent that the amended complaint can be read to assert an Eighth Amendment cruel and unusual punishment claim against any Correctional Defendant based on alleged verbal harassment of plaintiff, such conduct is not actionable under § 1983. *See, e.g., Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Harris v. Keane,* 962 F.Supp. 397, 406 (S.D.N.Y.1997) ("Allegations of threats, verbal harassment or profanity, without any injury or damage, do not state a claim under § 1983."); *Ragland v. Crawford,* No. 95 Civ. 10069(DC), 1997 WL 53279, at *4 (S.D.N.Y. Feb. 7, 1997) (threats of future adverse disciplinary action against inmate do not constitute harassment); *Santiago v. Coughlin,* No. 85 Civ. 2936, 1990 WL 4741 at *4 (E.D.N.Y. Jan. 17, 1990) (verbal harassment by a guard does not state a cause of action); *Wright v. Santoro,* 714 F.Supp. 665, 667 (S.D.N.Y.) (racially derogatory remarks by a guard do not violate an inmate's constitutional rights), *aff'd,* 891 F.2d 278 (2d Cir.1989).

### 4. *Deliberate Indifference*

■ The amended complaint arguably can be read to assert an Eighth Amendment deliberate indifference claim against defendants Keyser, Patterson, and DiTommaso. (*See* Am. Compl., ¶¶ 54, 71, 82, 84,

& 112). Plaintiff's amended complaint does not satisfy the second prong of the deliberate indifference test with respect to these defendants, however, for he fails to allege that any of them knew of and disregarded an excessive risk to his health. Accordingly, plaintiff's deliberate indifference claim against Keyser, Patterson, and DiTomasso, is dismissed.

### 5. *Denial of Due Process*

The amended complaint can be read to allege a Fourteenth Amendment denial of due process claim against defendants Nagy, Blaetz, and Gwen Schneider. Plaintiff alleges that he was denied due process of law at three separate disciplinary hearings, held on August 7, 1997, April 28, 1999, and July 5, 1999.

Specifically, Rivera alleges that defendant Nagy falsely testified at the August 7, 1997 hearing about the events that led to the hearing; Blaetz, the presiding officer at the hearing, found Rivera guilty of all charges and sentenced Rivera to 90 days in "confinement" and 120 days loss of privileges. Rivera further alleges that Gwen Schneider, the officer who presided over the April 28, 1999 hearing, was biased against him by her personal connection with several of the defendants named in this suit; Gwen Schneider found Rivera guilty of lying to an officer and sentenced him to three days confinement in his cell. Finally, Rivera alleges that Nagy, the presiding officer at the July 5, 1999 hearing, was biased against him because Nagy was already a defendant in this lawsuit at the time he presided over the hearing; Nagy found Rivera guilty of two of the charges against him and sentenced him to 30 days confinement to his cell and loss of privileges.

To prevail on a § 1983 claim for denial of due process at a disciplinary hearing, a prisoner must establish both that the disciplinary confinement or restraint creates " 'an atypical and significant hardship' " on the inmate in relation to the ordinary incidents of prison life and that "the state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir.1996) (quoting *Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). A disciplinary sanction does not meet the *Sandin* "atypical and significant hardship" standard unless it is "onerous." *Jenkins v. Haubert*, 179 F.3d 19, 28 (2d Cir.1999). While the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard, *see id.*, the Court of Appeals recently suggested that confinement for a period of less than 101 days would *not* constitute an atypical and significant hardship.[6] *See Colon v. Howard*, 215 F.3d 227, 231–32 (2d Cir. 2000) (discussing *Sealey v. Giltner*, 116 F.3d 47 (2d Cir.1997), in which confinement of 101 days was held not to have met *Sandin* standard).

If a prisoner satisfies both these elements, the Court then addresses " 'whether the deprivation of that liberty interest occurred without due process of law.' " *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir.1997) (quoting *Bedoya v. Coughlin*, 91 F.3d 349, 351–52 (2d Cir.1996)); *see Jackson v. Johnson*, 15 F.Supp.2d 341, 347 (S.D.N.Y.1998). The Second Circuit has emphasized that the *Sandin* analysis en-

---

**6.** Expressing "only [his] own views on this issue and not those of the panel," Judge Newman advocated "a bright-line rule that confinement in normal SHU conditions of more than 180 days meets the *Sandin* standard." *Colon*, 215 F.3d at 232. Conversely, confinement of 180 days or less would not meet the *Sandin* standard. Among the other reasons for his belief that a bright-line rule would be appropriate in the context of *Sandin* claims, Judge Newman observed that "the district judges of this Circuit would significantly benefit from use of a standard that would permit prompt dismissal of the many cases where the facts alleged in the complaint demonstrate that the duration and conditions of confinement do not exceed an announced standard." *Id.* at 233.

tails both a consideration of the duration of the challenged confinement as well as a fact-intensive examination of the conditions of that confinement. *See, e.g., Ayers v. Ryan,* 152 F.3d 77, 83 (2d Cir.1998); *Arce v. Walker,* 139 F.3d 329, 336 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997).

■ Even assuming that all of Rivera's allegations against Nagy, Blaetz, and Gwen Schneider are true, the amended complaint fails to satisfy the *Sandin* test. After the three disciplinary hearings, Rivera was confined to his cell for periods of ninety days, three days, and thirty days, respectively. These relatively short periods of confinement do not constitute an atypical or significant hardship. Moreover, Rivera was not confined in Green Haven's SHU, but to his own cell. Because plaintiff's complaint contains no allegations that would indicate that the length or conditions of his confinement were "atypical or significant," his due process claims against Nagy, Blaetz, and Gwen Schneider must be dismissed.

**D. *Official/Supervisory Defendants***

Plaintiff alleges that the Official/Supervisory Defendants are liable for the unconstitutional actions of their employees. With the exception of George Schneider, all of these defendants argue that they cannot be liable under § 1983 because they were not personally involved in the alleged constitutional violations.

■■ Personal involvement of a defendant in an alleged constitutional deprivation is "a prerequisite to an award of damages under § 1983." *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986) (internal quotations and citation omitted). The personal involvement of a supervisory defendant may be shown by evidence that the defendant "(1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report

or appeal; (3) created a custom or policy fostering the violation or allowed the custom or policy to continue after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation." *Sealey,* 116 F.3d at 51 (citing *Williams,* 781 F.2d at 323–24). "Liability may not be premised on the respondeat superior or vicarious liability doctrines, ... nor may a defendant be liable merely by his connection to the events through links in the chain of command." *Prince v. Edwards,* No. 99 Civ. 8650(DC), 2000 WL 633382, at *6 (S.D.N.Y. May 17, 2000) (internal quotations and citation omitted).

■ As alleged, the involvement of the Official/Supervisory Defendants does not fall into any of these categories. First, Rivera fails to allege any facts demonstrating that defendants Goord, Artuz, Zwillinger, McCoy, Klein,[7] and Bliden were personally involved in or even knew of the alleged constitutional violations; he merely asserts that he wrote to these defendants complaining about the conduct of various Medical and Correctional Defendants and that his complaints were ignored. These allegations are insufficient to hold these Official/Supervisory Defendants liable under § 1983. *See, e.g., Woods v. Goord,* 97 Civ. 5143(RWS), 1998 WL 740782, at *5 (S.D.N.Y. Oct. 23, 1998); *Cox v. Colgane,* No. 94 Civ. 6361(DAB), 1998 WL 148424, at *6 (S.D.N.Y. Mar. 27, 1998); *Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y. 1989).

Second, even assuming that Goord, Artuz, Zwillinger, McCoy, Klein, and Bliden had received Rivera's complaints and were aware of the allegedly unconstitutional conduct of the Medical and Correctional Defendants, Rivera has alleged no facts by which it could be inferred that any of these defendants were deliberately indifferent to the violations or grossly negligent in supervising any of the other defendants. Rivera contends that Goord, Artuz, Zwillinger, Stevens, and Bliden are liable be-

---

**7.** Rivera concedes that McCoy and Klein had no personal involvement in any of the alleged

constitutional violations. (*See* Pl. Mem. at 9–10).

cause they "affirmatively promot[ed] a policy which sanctioned and perpetuated the intentional disregard of plaintiff's constitutional rights by the other defendants" (Pl. Mem. at 8; *see also* Am. Compl., ¶ 120), but the amended complaint contains no allegations of how these defendants "affirmatively promoted" any such policy. Accordingly, the claims against Goord, Artuz, Zwillinger, McCoy, Klein, and Bliden must be dismissed for lack of personal involvement.

Third, although Rivera alleges some personal involvement on the part of George Schneider, the allegations are insufficient. Rivera alleges that in 1997, Schneider directed a sham investigation into one of Rivera's retaliation grievances "in order to cover ... his officials['] illegal conduct." (Am.Compl., ¶ 66). Rivera further alleges that in 1999, Schneider ignored additional complaints of retaliation lodged by Rivera against Nagy, Mitchetti, and Keyser. (*See id.,* ¶ 105). Even assuming these allegations are true, the alleged conduct does not fall within any of the *Sealey* categories, and thus plaintiff's claims against George Schneider are dismissed as well.

### E. *Plaintiff's Other § 1983 Claims*

I have considered Rivera's other purported § 1983 claims (*see, e.g.,* Am. Compl., ¶¶ 24, 117, 112, 121 & n. 1) and find them to be without merit as a matter of law.

### F. *Qualified Immunity*

■ All of the defendants contend that even if plaintiff states a viable § 1983 claim against them, they are entitled to qualified immunity. "[A] prison official ... may claim qualified immunity from suit ... for [his] discretionary acts that do 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hathaway,* 37 F.3d at 67 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Even where a pris-

oner's rights are clearly established, "qualified immunity is still available to an official if it was 'objectively reasonable for the public official to believe that his acts did not violate those rights.'" *Id.* (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991)).

Defendants contend, in a conclusory fashion, that their actions were objectively reasonable. (*See* Def. Mem. at 21–22). Because plaintiff has adequately pled claims for deliberate indifference, retaliation, and excessive force, however, I hold that defendants are not entitled to qualified immunity based on the existing record. Defendants' motion, insofar as it seeks dismissal of the § 1983 claims based on qualified immunity, is denied.

## II. *Plaintiff's §§ 1985 and 1986 Claims*

■ Plaintiff also brings suit pursuant to 42 U.S.C. §§ 1985 and 1986. Rivera alleges in broad language that unspecified defendants conspired to violate his constitutional rights (*see* Am. Compl, ¶¶ 20, 116), but he alleges no specific facts that would indicate the existence of any kind of conspiracy against him. The mere use of the word "conspiracy," without more, does not state a claim under § 1985. Accordingly, Rivera's § 1985 claim is dismissed against all defendants. Because § 1985 liability is a predicate to § 1986 liability, plaintiff's § 1986 claim is also dismissed against all defendants. *See* 42 U.S.C. § 1986; *Brown v. City of Oneonta,* 221 F.3d 329, 341 (2d Cir.2000).

### *CONCLUSION*

All claims against defendants Goord, Artuz, Zwillinger, Stevens, Licerio, Stolfi, Cortes, Miller, Keyser, Schmitt, Ward, Tierney, Patterson, Surber, DiTommaso, Frazier, Colatosti, Brenda Schneider, Mitchetti, Daly, Middleton, George Schneider, Gwen Schneider, Quackenbush, Klein, Blaetz, Totton, McCoy, Bliden, Green Haven Correctional Facility, and St.

Francis Medical Center are dismissed with prejudice.

Plaintiff's Eighth Amendment deliberate indifference to medical needs claim survives as to defendants Selwin, Fratalone, Kershenbaum, Silver, Sohng, Mamis, and Pecenco.

Plaintiff's First Amendment retaliation claim survives as to defendants Kelly, Belton, Brady, Meyer, and Nagy.

Plaintiff's Eighth Amendment excessive force claim survives as to defendants Kelly, Belton, and Brady.

All claims against defendants Selwin, Fratalone, Kershenbaum, Silver, Sohng, Mamis, Pecenco, Kelly, Belton, Brady, Meyer, and Nagy in their official capacities are dismissed with prejudice. All § 1983 claims asserted against these defendants individually, other than the three claims addressed above, are dismissed with prejudice, as are plaintiff's § 1985 and § 1986 claims.

A pretrial conference will be held on October 20, 2000, at 3 p.m., at Courtroom 11A, Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York.

SO ORDERED.