Mark **WEBSTER**, Lana Mills, Annette Mills, Delroy McKenzie, Plaintiffs,

v.

**THE CITY OF NEW YORK,** et al., Defendants.

No. 03 CIV. 0524(RWS).

United States District Court, S.D. New York.

Aug. 27, 2004.

Cardinale Hueston & Marinelli, Brooklyn, NY (Richard J. Cardinale, of Counsel), for Plaintiffs.

Honorable Michael A. Cardozo, Corporation Counsel of the City of New York, New York City (Sheryl A. Bruzzese, Assistant Corporation Counsel, of Counsel), for Defendants.

## OPINION

SWEET, District Judge.

Defendants the City of New York (the "City"), Police Commissioner Ray Kelly ("Kelly"), former Police Commissioners Bernard Kerik ("Kerik") and Howard Safir ("Safir"), Police Officer Davie Rodriguez ("Rodriguez"), Sergeant Michael Murphy ("Murphy"), Police Officer Scott Velasquez ("Velasquez"), Police Officer Andrew Bershad ("Bershad"), Police Officer Wayne Davis ("Davis"), Police Officer Cornelius O'Keefe ("O'Keefe"), Police Officer Jeffrey Sattali ("Sattali"), Police Officer Wilfredo Cortes ("Cortes"), Police Officer Clifton Clarke ("Clarke"), Police Officer Ezra

Moore ("Moore"), and Police Officer Carlos Lewis ("Lewis") (collectively, "Defendants")[1] have moved for partial summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure seeking the dismissal of certain of the claims of plaintiffs Annette Mills ("Mills"), Mark Webster ("Webster"), and Delroy McKenzie ("McKenzie") (collectively, "Plaintiffs"). For the reasons set forth below, Defendants' motion for partial summary judgment is granted in part and denied in part.

### Prior Proceedings

Plaintiffs, along with a fourth plaintiff, Lana Mills ("Lana"),[2] commenced this action on January 23, 2003, pursuant to 42 U.S.C. § 1983, alleging, *inter alia*, deprivations of their First, Fourth, and Fourteenth Amendment rights with regard to an incident that occurred on August 31, 2002, when officers from the 67th Precinct entered Mills' home and arrested Lana, McKenzie and Webster. An amended complaint was filed on June 9, 2003, discovery proceeded, and Defendants filed the instant motion on January 8, 2004. Following briefing by the parties, the motion was deemed submitted without oral argument on February 18, 2004.

### The Facts

The facts are set forth based upon the parties' Local Civil Rule 56.1 statements and supporting materials, and are undisputed except as noted below. They do not constitute findings of fact by the Court.

Mills is the sole owner of 542 East 48th Street, Brooklyn, New York (the "Mills residence"). Lana is her daughter.

---

**1.** Kelly, Kerik and Safir were not named in Defendants' notice of motion, although correspondence submitted to the Court simultaneous with the motion indicates that Kelly, Kerik and Safir are among those seeking partial summary judgment here. Police Officer

Bernard, the only remaining defendant, is not so named.

**2.** The claims brought by Lana Mills were dismissed with prejudice by a stipulation and order of settlement and dismissal filed on January 8, 2004.

On August 30, 2002, Mills had a party at the Mills residence, and Mills, alone, invited a "good 50 people" to the party. (Declaration of Sheryl A. Bruzzese, dated Jan. 7, 2004 ("Bruzzese Decl."), Exh. D, at 124.) Mills told her guests to arrive before midnight. Mills was serving alcoholic beverages at the party.

Webster did not know Mills or Lana prior to August 30, 2002, and was hired by Mills to serve as a Disc Jockey ("DJ") at the August 30, 2002 function. Webster arrived at the Mills residence at approximately 8:00 p.m. Webster used professional DJ equipment at the August 30, 2002 party, the same type of DJ equipment used at night clubs. Webster invited some of his friends to Mills' party.

McKenzie arrived at the Mills residence at or about midnight on August 31, 2002. He did not know Mills or Lana prior to that date, and Mills did not invite McKenzie to come to her home on August 31, 2002.

Members of the New York City Police Department ("NYPD") arrived at the Mills residence between 12:30 a.m. and 1:00 a.m. on August 31, 2002. Civilians were standing in the front of the house, in the driveway, and in the backyard at the time the police arrived. People were drinking alcoholic beverages before the police arrived, and at the time the police arrived, three individuals were drinking beer in the driveway of the Mills residence.

Initially, there was only one police car on the scene. There were at least twenty guests present at the time of the incident. McKenzie observed two officers come into the yard and tell the DJ to lower the music, and Webster either lowered the music or turned the music off. McKenzie observed another three officers in front of the house.

A member of the NYPD told Mills to "keep the music down." (Bruzzese Decl., Exh. D, at 150, 152–53.) The officer who told Mills to keep the music down was, in her estimation, "nice" to her. (Bruzzese Decl., Exh. D, at 152.)

People that Mills did not know were in front of the Mills residence. An individual was drinking beer in the middle of the driveway leading to Mills' backyard. McKenzie overheard officers tell the individual in the driveway, in substance, that he can't drink in the driveway. Webster claims that he subsequently questioned the officers whether they could issue someone a summons for drinking an alcoholic beverage on private property. Webster asserts that after he asked them this question, the officers, acting in concert, stated in substance "Who are you the fucking judge? Now, you are going to be locked up instead of him." (See Bruzzese Decl., Exh. H, at 198–203.) Webster alleges that Murphy had his ticket book in his hand at that time.

Defendants assert that Bershad did not punch, kick, hit, or mace Webster. Plaintiffs dispute this assertion and state that Bershad, acting in concert with several other of Defendants, forcefully threw Webster against a fence, forcefully bumped into Webster's chest with his chest, grabbed Webster's shirt, slammed the metal cuffs on him, yanked his arms, handcuffed him excessively tight, and yanked him and tossed him around by the tight cuffs. Because of the yanking and the excessively tight handcuffs, Plaintiffs assert that Webster had marks on his wrists for two months and later a scar. To this day, Webster suffers from tingling and numbness to his wrists because of the tight cuffs, according to Plaintiffs.

Defendants assert that Webster kept walking when the officers attempted to put

his hands behind his back, although Plaintiffs dispute this assertion.

At the time of Webster's arrest, there were no more than five officers in front of the Mills residence. The only force Mills and McKenzie observed the officers utilize on Webster was to push him up against the fence and try to get his hands behind his back to handcuff him. Neither Mills nor McKenzie observed a police officer punch Webster, strike him with an open hand, or mace him. McKenzie did not observe Webster hit the ground at any time or observe officers slam him into a gate. Mills did not observe the police officers handcuff Webster.

Mills alleges that at the time Rodriguez attempted to handcuff Lana, Rodriguez pushed Mills out of the way. When Rodriguez allegedly pushed Mills, according to Mills "it really didn't hurt" her, although she felt "[i]nstant pain." (Bruzzese Decl., Exh. D, at 179–80.) When asked if she felt any pain as a result of the alleged push, Mills stated that "[i]t wasn't a big deal, really." (Bruzzese Decl., Exh. D, at 180.)

Mills alleges that Rodriguez shoved her once or twice. She did not fall as a result of allegedly being pushed by Rodriguez. Every time Rodriguez allegedly pushed Mills out of the way, she stood back up. Rodriguez did not say anything to Mills when he was attempting to handcuff Lana. McKenzie did not observe any of the officers touch Mills.

Mills alleges that Rodriguez then proceeded to drag Lana across the street with just one handcuff. As the officers attempted to arrest Lana, Mills was running behind Lana, screaming, hollering and questioning why the police were arresting her daughter. Lana was, according to Mills, "[s]creaming her head off." (Bruzzese Decl., Exh. D, at 196.) Mills and Lana were screaming so loud that, according to Mills, everybody started running out

of the backyard. At the time the officers were attempting to handcuff Lana, people from the backyard came out to the front of the house. Other people were screaming and yelling at the time Lana was arrested. In this midst of all this "confusion," as Mills termed it, she heard the police officers radio for help. (Bruzzese Decl., Exh. D, at 164.)

At the time of Lana's arrest, Mills was, by her own admission, jumping, screaming and calling for everybody's attention. According to Defendants, Mills was following behind the officers who were taking Lana across the street. Plaintiffs assert that Mills was following Rodriguez who was "dragging" Lana across the street by her hair and by one of her arms. (Bruzzese Decl., Exh. D, at 198–99.)

According to Mills, members of the NYPD threw her up against the vehicle face-first to stop her from running behind them. Mills believed these officers were just trying to restrain her. She alleges that her face, hands, chest, and knees made contact with the vehicle, although she tried to block the fall into the vehicle with her hands.

Mills sustained no bruises to her face or knees as a result of hitting the vehicle, and she sustained no injuries as a result of hitting the vehicle. Mills described the pain she experienced as an "instant" pain. (Bruzzese Decl., Exh. D, at 212.) The parties dispute whether Mills felt pain for a few days after the incident. Plaintiffs assert that the pain Mills felt was treated with Motrin and that she experienced emotional distress and trembled for days.

At the time that Mills was allegedly thrown against the car, she was, by her own account, "hysterical" and "screaming [her] head off." (Bruzzese Decl., Exh. D, at 206.) Mills was screaming "You're hurting her. Leave her alone." (Bruzzese

Decl., Exh. D, at 209.) She also screamed: "What are you doing to my child? I'm her mother. Tell me what's going on." (Bruzzese Decl., Exh. D, at 206.) Mills' neighbor came out of the house across the street because she heard Mills screaming. Thereafter, Mills rolled over, got off the vehicle, and sat down on the sidewalk. One of the officers then told Mills, in substance, to calm down, as did Mills' neighbor. Mills stated to the officer: "You're a black officer and you see what these other cops are doing to us, and you stood there and said nothing." (Bruzzese Decl., Exh. D, at 207.)

According to Defendants, when Lana was placed in the police vehicle, Mills opened the police vehicle's door and entered the police vehicle of her own volition. Plaintiffs assert that Lana was pulled into the police vehicle by her hair and then the door to the vehicle was closed. Mills thereupon opened the door to see what was being done to Lana, according to Plaintiffs, and saw that Rodriguez had his knee on Lana's chest and that he was still yanking her by the hair.

Thereafter, two police officers pulled Mills out of the police vehicle and closed the door, after which the vehicle left with Lana inside. Mills did not sustain any physical injuries as a result of being pulled out of the police vehicle.

At the same time that police officers were arresting Lana, McKenzie was, by his own admission, "speaking loudly." (Bruzzese Decl., Exh. F, at 92.) He made a comment to officers and made it loud so that they could hear him, stating in substance "Why are you arresting her; she has not done anything wrong." (See Bruzzese Decl., Exh. F, at 91–92.)

According to Velasquez's sworn statement, he observed McKenzie make a gun gesture with his hand and reach for his waistband. Velasquez then addressed McKenzie, according to Defendants, and McKenzie looked at Velasquez, turned, and ran into the Mills residence. Plaintiffs assert that, in response to McKenzie's comment, one of the police officers stated in substance "Who has got the smart mouth," and then one of Defendants ran toward McKenzie. (See Bruzzese Decl., Exh. F, at 92–94.) McKenzie ran away, according to Plaintiffs, because he was scared that Defendants were going to beat him like they beat Lana and Webster. At no time, Plaintiffs assert, did McKenzie reach into his waistband as if he were reaching for a gun or gesture as if his hand were a gun.

Webster noticed that McKenzie "dart[ed]" or "took off running" and observed officers chase him into the backyard of the Mills residence. (Bruzzese Decl., Exh. H, at 314–16, 331–32.) McKenzie ran up the driveway and into the backyard of the Mills residence. McKenzie ran inside the Mills residence. Police officers followed McKenzie inside the Mills residence. According to Defendants, Webster observed the officers who chased McKenzie up the driveway immediately follow McKenzie out the front door of the Mills residence. Plaintiffs assert that Webster observed the officers chase McKenzie inside the Mills residence. The chase did not last longer than two minutes.

McKenzie alleges that the officers picked him up five feet from the ground and "body-slammed" him on the concrete in front of the Mills residence. (Bruzzese Decl., Exh. F, at 97.) Plaintiffs assert that McKenzie was also punched in the ribs, and his head, neck, and back struck the ground. McKenzie, according to Plaintiffs, experienced pain, dizziness, and a loss of consciousness. He went to the hospital for his injuries and was prescribed painkillers. Defendants assert that McKenzie did not sustain any cuts, bruises, abrasions, or

scrapes as the result of the purported body-slam to the ground.

McKenzie was handcuffed and placed under arrest. Plaintiffs assert that he was handcuffed excessively tight.

Mills observed officers who appeared to be looking for something shining flashlights in her backyard. She also observed police officers inside her home but did not know what they were doing inside. According to Mills, the police officers did not break, damage, or take anything from inside the Mills residence.

Webster was arrested and charged with resisting arrest and disorderly conduct. Webster accepted an adjournment in contemplation of dismissal and the charges were ultimately dismissed on January 22, 2003.

McKenzie was arrested and charged with assault in the third degree, resisting arrest, and inciting a riot. The charges against McKenzie were dismissed on December 4, 2002 pursuant to the speedy trial provision of New York's Criminal Procedure Law, Section 30.30.

Mills was never arrested by members of the NYPD. On August 31, 2002, Mills, her husband Lancelot Hector ("Hector"), and her daughter Collete ("Collete") went to the courthouse. Mills, her husband, and Collete were not permitted to enter the courthouse due to a separate, unrelated incident involving a New York State Office of Court Administration Court Officer. The New York State Court Officers issued Mills and Collette summonses. None of the Defendants were personally involved in the incident involving Mills, Hector, Collete, and the New York State Court Officer. The incident involving the New York State Court Officer is wholly unrelated to the August 31, 2002 incident at the Mills residence.

### The Summary Judgment Standard

Summary judgment is granted only if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); SCS Communications, Inc. v. Herrick Co., Inc., 360 F.3d 329, 338 (2d Cir.2004); see generally 11 James Wm. Moore, et al., Moore's Federal Practice ¶ 56.11 (3d ed. 1997 & Supp. 2004). The court will not try issues of fact on a motion for summary judgment, but, rather, will determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate where the moving party has shown that "little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223–24 (2d Cir.1994) (citations omitted). "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." Rodriguez v. City of New York, 72 F.3d 1051, 1060–61 (2d Cir.1995).

A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct. 2505;

see also R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 57 (2d Cir.1997). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248, 106 S.Ct. 2505; accord Quarles v. Gen. Motors Corp., 758 F.2d 839, 840 (2d Cir.1985).

In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Gibbs–Alfano v. Burton, 281 F.3d 12, 18 (2d Cir.2002). Thus, "[s]ummary judgment may be granted if, upon reviewing the evidence in the light most favorable to the nonmovant, the court determines that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Richardson v. Selsky, 5 F.3d 616, 621 (2d Cir.1993). The non-movant must invoke more than just "metaphysical doubt as to the material facts." Matsushita Elec. Indus., 475 U.S. at 586, 106 S.Ct. 1348. In order to defeat a motion for summary judgment, the non-moving party must offer sufficient evidence to enable a reasonable jury to return a verdict in its favor. See Anderson, 477 U.S. at 248, 106 S.Ct. 2505; Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 101 (2d Cir.2001); Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir.1998).

### Discussion

In their amended complaint, Plaintiffs asserted claims against Police Officer Bernard, Rodriguez, Murphy, Velasquez, Bershad, Davis, O'Keefe, Sattali, Cortes, Clarke, Moore, and Lewis on the grounds that their behaviors in conjunction with the incident at the Mills residence on August 31, 2002, constituted an unlawful search and seizure, false arrest and impris-

onment, abuse of process, an unreasonable use of force, assault and battery, malicious prosecution, punishment without due process, denial of a fair trial, and retaliation for free speech, in violation of Plaintiffs' rights under 42 U.S.C. § 1983, the First, Fourth, Sixth, and Fourteenth Amendments to the U.S. Constitution, and state law.

Plaintiffs's amended complaint also alleges that the City directly caused the constitutional violations suffered by Plaintiffs because the City was allegedly aware that the officers involved in the incident at the Mills residence were unfit to be police officers, it was highly likely that they would commit the acts alleged in this action, and the City exercised deliberate indifference by failing to take remedial action, retrain the officers, or adequately discipline them or investigate prior complaints. Plaintiffs claim that the City's conduct, in addition to violating 42 U.S.C. § 1983 and the First, Fourth, Sixth, and Fourteenth Amendments to the U.S. Constitution, amounts to negligent hiring, training, monitoring, and retention of incompetent employees, in violation of state law. They further claim that the City is vicariously libel under state law for the individual defendants' illegal acts.

Finally, Plaintiffs' amended complaint alleges claims against Kelly, Ceric, and Safir on the grounds that they created and allowed to continue a policy or custom under which unconstitutional practices occurred, they were grossly negligent in supervising subordinates who committed the wrongful acts, and they exhibited deliberate indifference to the rights of others by failing to act on information indicating that unconstitutional acts were occurring. Plaintiffs claim that Kelly's, Kerick's, and Safir's conduct amounts to negligent hiring, training, monitoring, and retention of incompetent employees, in violation of

state law, and further constitutes violations of 42 U.S.C. § 1983 and the First, Fourth, Sixth, and Fourteenth Amendments to the U.S. Constitution.

In their papers submitted in opposition to the instant motion, Plaintiffs have withdrawn all claims against Sattali, O'Keefe, and Davis, as well as all claims against Kelly, Kerik, and Safir. In addition, Plaintiffs have withdrawn or assert that they never made certain claims identified in Defendants' papers, namely, claims of false arrest and malicious prosecution with regard to Mills, malicious prosecution with regard to Webster, claims relating to negligence, negligent hiring and retention of incompetent employees, or claims of conspiracy.

## I. Disputed Issues of Fact Preclude Summary Judgment on Mills' Claim of Unlawful Entry

Plaintiffs claim that Defendants unlawfully entered and searched her home during the August 31, 2002 incident. Defendants do not dispute that they were without a warrant when certain officers entered the Mills residence, but they argue that the warrantless entry of the Mills residence was constitutionally permissible because the police only entered her home in hot pursuit of McKenzie, who admittedly ran from the police through the Mills residence.

■ As the Court of Appeals for the Second Circuit has observed,

> The Supreme Court has repeatedly instructed that it is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable, *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), and that in cases involving warrantless searches and seizures, the *government* bears the heavy burden of

proving that entry into a defendant's home was justified. *Coolidge v. New Hampshire*, 403 U.S. 443, 474–75, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

*United States v. Zabare*, 871 F.2d 282, 289 (2d Cir.1989) (emphasis in original and internal quotation marks omitted). This principle applies "with equal force in the context of warrantless entries in the home made for purposes of arrest, even where there is independent probable cause for such an arrest." *Id.* "Before agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." *Welsh v. Wisconsin*, 466 U.S. 740, 750, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984); *see also United States v. Gordils*, 982 F.2d 64, 69 (2d Cir.1992) (noting, in the context of a warrantless home entry claim, that "[i]t is well-settled that the warrant requirement of the Fourth Amendment must yield in those situations in which exigent circumstances require law enforcement officers to act without delay."). Thus, it has become a "firmly established rule that 'police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home.'" *Loria v. Gorman*, 306 F.3d 1271, 1283 (2d Cir.2002) (quoting *Kirk v. Louisiana*, 536 U.S. 635, 638, 122 S.Ct. 2458, 153 L.Ed.2d 599 (2002) (per curiam)); *see Dzinanka v. County of Suffolk*, 932 F.Supp. 59, 62 (E.D.N.Y.1996) "Where ... a warrantless arrest occurs inside an individual's home, constitutionality depends not only upon the existence of probable cause, but upon the existence of exigent circumstances or consent as well.").

■ The Supreme Court has determined that it is constitutionally permissible for the police to make a warrantless entry

into a private dwelling when the police are in "hot pursuit" of a suspect. *See United States v. Santana,* 427 U.S. 38, 42–43, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976); *see also Minnesota v. Olson,* 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990) (noting that "a warrantless intrusion may be justified by hot pursuit of a fleeing felon, or imminent destruction of evidence, ... or the need to prevent a suspect's escape or the risk of danger to the police or to other persons inside our outside the dwelling"). Hot pursuit involves following an individual from a public place into a private place. *See generally Santana,* 427 U.S. at 42–43, 96 S.Ct. 2406. The hot pursuit doctrine applies when the pursuit is immediate and fairly continuous from the scene of the crime. *See Welsh,* 466 U.S. at 753, 104 S.Ct. 2091 (concluding that entry by police into a dwelling was not warranted under the hot pursuit doctrine when the police did not have probable cause to believe that the defendant had committed a crime).

 The phrase "hot pursuit" is " 'not a limitation but rather an illustration of the kind of exigent circumstance justifying entry without a warrant to arrest a suspect.' " *United States v. Crespo,* 834 F.2d 267, 271 (2d Cir.1987) (quoting *Dorman v. United States,* 435 F.2d 385, 391 (D.C.Cir. 1970)). Thus, even in the absence of hot pursuit, the police may make a warrantless entry if there is probable cause to believe that exigent circumstances exist. *See, e.g., United States v. Santos,* 303 F.Supp.2d 333, 345 (S.D.N.Y.2003). In determining whether exigent circumstances exist, a court should look to the totality of circumstances, including:

(1) the gravity or violent nature of the offense with which the suspect is charge; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause ... to believe that the suspect committed the crime; (4)

strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry.

*Loria,* 306 F.3d at 1284 (citing *United States v. Fields,* 113 F.3d 313, 323 (2d Cir.1997) (quoting *United States v. Mac-Donald,* 916 F.2d 766, 769–70 (2d Cir.1990) (en banc))); *see also United States v. Brown,* 52 F.3d 415, 421–22 (2d Cir.1995). These factors are " 'merely illustrative, not exhaustive, and the presence or absence of any one factor is not conclusive.' " *Brown,* 52 F.3d at 422 (quoting *United States v. Gordils,* 982 F.2d 64, 69 (2d Cir.1992)).

"[T]he legality of entry to effect an arrest is a question quite distinct from whether the arrest was properly based upon probable cause or an arrest warrant." *Rodriguez v. Butler,* 536 F.2d 982, 985 (2d Cir.1976). Nonetheless, this distinction does not dispense with the need to establish probable cause in addition to exigent circumstances to justify entry into a residence. *See, e.g., United States v. Gomez,* 633 F.2d 999, 1008 (2d Cir.1980).

 Defendants argue that their entry of the Mills residence without a warrant was justified because they were in hot pursuit of McKenzie. It appears undisputed that McKenzie fled from the officers and, in doing so, ran through the Mills residence. Further, it appears on this record that the police entered the Mills residence in pursuit of McKenzie and that their pursuit was immediate. Notwithstanding these undisputed facts, Defendants have offered no authority supporting their contention that hasty retreat, alone, accords officers a reasonable suspicion that criminal activity is afoot and that the individual fleeing may be armed or dangerous. Their citations of *United States v. Martinez–Gonzalez,* 686 F.2d 93 (2d Cir.1982), and *People v. Dawkins,* 201 A.D.2d 336,

607 N.Y.S.2d 315 (N.Y.App. Div. 1st Dep't 1994), are inapposite, as both cases demonstrate that officers must possess reasonable suspicions concerning an individual prior or in addition to a suspect's hasty retreat to justify officers' pursuit.

Whether such reasonable suspicions existed here sufficient to establish probable cause constitutes a triable issue of material fact. Defendants contend that Velasquez observed McKenzie make a gun gesture with his hand and reach toward his waistband, and that, based on the totality of the circumstances, McKenzie could reasonably be construed as a threat not only to the police but to the crowd in general. Plaintiffs dispute Defendants' account, and argue that McKenzie never reached into his waistband as if he were reaching for a gun or made a gesture as if his hand were a gun. In light of these disputed facts, summary judgment with regard to Mills' claim of unlawful entry is not warranted.

## II. Disputed Issues of Fact Preclude Summary Judgment on Mills' Excessive Force Claim

Plaintiffs argue that Mills was subjected to unreasonable force on two occasions during the August 31, 2002 incident, first when she was pushed by Rodriguez once or twice while Rodriguez was attempting to place handcuffs on Lana and, second, when Mills was pushed onto a police vehicle face-first. Defendants argue that each of these claims of unreasonable force should be dismissed because the uses of such force were *de minimis.*

■ The Second Circuit has established that "outside the context of an arrest, a plaintiff may make claims of excessive force under § 1983 under the Due Process Clause of the Fourteenth Amendment."

*Hemphill v. Schott,* 141 F.3d 412, 418 (2d Cir.1998) (emphasis added) (citing *Rodriguez v. Phillips,* 66 F.3d 470, 477 (2d Cir. 1995)); *see also Tierney v. Davidson,* 133 F.3d 189, 199 (2d Cir.1998) ("Plaintiffs do not assert that they were arrested or seized, and therefore these [Section 1983] claims fall outside the Fourth Amendment protections ... and are governed instead by the Due Process Clause of the Fourteenth Amendment.") As Mills was not arrested on August 31, 2002, analysis of Mills' claim under the Fourteenth Amendment is appropriate, *see, e.g., Bove v. New York City,* No. 98 Civ. 8800(HB), 1999 WL 595620, at *5 (S.D.N.Y. Aug.6, 1999), and Mills' claim need not be liberally construed as a seizure under the Fourth Amendment as Defendants suggest.[3]

■ "Not every push or shove by a state officer constitutes a violation of substantive due process." *Robison v. Via,* 821 F.2d 913, 923 (2d Cir.1987). Whether the constitutional line has been traversed depends on a four-part test employed "to determine whether force is excessive under the Fourteenth Amendment, *i.e.,* whether it 'shocks the conscience.'" *Tierney,* 133 F.3d at 199. The elements of the test are: "[1] the need for the application of force, [2] the relationship between the need and the amount of force that was used, [3] the extent of injury inflicted, and [4] whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973)) (alteration in original). Where an officer's use of force was "*de minimis,* necessary, appropriate, and benign" a claim of excessive force under the

---

**3.** No allegations concerning Mills' belief in her freedom to leave have been made here such as would suggest a Fourth Amendment seizure. *See generally United States v. Newton,* 369 F.3d 659, 672 (2d Cir.2004) (describing the test for a Fourth Amendment seizure).

Fourteenth Amendment will not stand. *Id.* (directing entry of summary judgment for defendants). While the severity of a plaintiff's injuries is not determinative as to the reasonableness of force used, the extent of the injuries are relevant to the consideration of whether the force used was reasonable. *See Hudson v. McMillian,* 503 U.S. 1, 7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (ruling in the Fourth Amendment context); *Robison,* 821 F.2d at 924 ("If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe.").

■ With respect to the first instance in which Mills claims she was subjected to excessive force, Mills concedes that she did not fall and that she simply stood back up each time Rodriguez pushed her. According to Mills, she felt "[i]nstant pain" as a result of Rodriguez's actions, although she acknowledged that "it really didn't hurt." (Bruzzese Decl., Exh. D, at 179–80.) Mills also claims that she suffered excessive force when she was pushed onto a police vehicle, blocking the fall with her hands although she alleges that her face, hands, chest, and knees made contact with the vehicle. Mills sustained no bruises to her face or knees as a result of hitting the vehicle, and she described the pain she experienced as an "instant" pain. (Bruzzese Decl., Exh. D, at 212.) The parties dispute whether Mills felt pain or soreness for a few days after the incident, although Plaintiffs assert that the pain Mills felt was treated with Motrin and that she experienced emotional distress and trembled for days. Mills acknowledges that at the time she was thrown up against the vehicle, she was, by her own account, "hysterical" and "screaming [her] head off." (Bruzzese Decl., Exh. D, at 206.)

Viewing the evidence in the light most favorable to Plaintiffs, Mills' injuries appear relatively minor, *see, e.g., Johnson v. Doherty,* 713 F.Supp. 69, 71 (S.D.N.Y.1989) (deeming injuries minor where officers allegedly punched the plaintiff and struck him twice in the chest with a night stick, he felt only "momentary" pain lasting about "a second," required no medical treatment, and suffered no lasting bruises); *see also Robison,* 821 F.2d at 923–24 (concluding that the "meagre assertion that [a defendant] had pushed or pulled or pried at [the plaintiff's] fingers ... was entirely insufficient to show excessive force," but allegations that another defendant pushed the plaintiff against the inside of a car's door, yanked her out, threw her up against the fender, and twisted her arm behind her back were sufficient to prevent summary dismissal), and a reasonable factfinder may well conclude that they do not rise to the level of a constitutional violation, but they are not, as a matter of law, *de minimis. Cf. Griffin v. Crippen,* 193 F.3d 89, 91–92 (2d Cir.1999) (reasoning, in the context of a summary judgment motion on an Eighth Amendment claim, that while the appellant's excessive force claim was weak and his supporting evidence extremely thin, his minor injuries, including a bruised shin and swelling in one knee, could not be said to be *de minimis* as a matter of law); *but compare Tierney,* 133 F.3d at 199 (deeming three instances in which the plaintiffs' arms were grabbed and one instance in which a plaintiff was hit with a nightstick after she engaged in a struggle with a police officer and a third person *de minimis* ). Moreover, as the parties dispute the existence or extent of Mills' injuries, an issue of material fact for the jury is created.

In addition, a factual issue remains regarding whether the force employed in the two instances identified by Plaintiffs was necessary and reasonable. Defendants have offered evidence to support the no-

tion that the force employed was necessary in light of the circumstances presented, including the fact that Mills was screaming and by her own account, "hysterical." (Bruzzese Decl., Exh. D, at 206.) Under Defendants' analysis, it was both necessary and appropriate for the police officers involved to prevent Mills from interfering with the arrest of Lana. Plaintiffs have not offered any allegations to support the claim that the first instance of excessive force alleged, involving Rodriguez pushing Mills, was unnecessary or unreasonable. They claim, however, that those Defendants who threw Mills onto the police vehicle face-first did so in retaliation for her comments questioning what they were doing to Lana. In light of these varying accounts of the events surrounding Defendants' use of force, genuine issues remain as to whether force was necessary and whether, if necessary, it was reasonable. Summary judgment as to Mills' excessive force claim is, accordingly, denied.

### III. A Triable Issue of Fact Precludes Summary Judgment on McKenzie's Malicious Prosecution Claim

▮ To state a claim under federal and state law for malicious prosecution, a plaintiff must show "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir.1995); *see also Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir.1997); *Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir.1991); *accord Broughton v. State*, 37 N.Y.2d 451, 457, 373 N.Y.S.2d 87, 93, 94 335 N.E.2d 310, 314 (1975).

▮ With regard to the first prong of this standard, Defendants is not dispute

that a criminal proceeding was initiated against McKenzie, but they argue that Plaintiffs cannot establish that any of the named Defendants initiated the prosecution, as the King's County District Attorney's Office made an independent determination to prosecute McKenzie, albeit one based on the facts as stated by the individual officers involved and by Velasquez in participating, whom Defendants characterize as a complaining witness. According to the Second Circuit, "[t]he exercise of independent judgment by the public prosecutor and his active role in initiating criminal prosecutions may decrease the likelihood that a complaining witness will be considered to have 'caused' or 'procured' the prosecution." *White v. Frank*, 855 F.2d 956, 962 (2d Cir.1988) (internal citations omitted). Nonetheless, police officers who are complaining witnesses in relation to a criminal proceeding, as Defendants acknowledge Velasquez is here, are not insulated from civil liability for malicious prosecution. *See id.* ("As with the grand jury, ... the public prosecutor's role in a criminal prosecution will not necessarily shield a complaining witness from subsequent civil liability where the witness's testimony is knowingly and maliciously false."); *Chimurenga v. City of New York*, 45 F.Supp.2d 337, 343 (S.D.N.Y.1999) ("Where a party is responsible for providing false information or manufactured evidence that influences a decision whether to prosecute, he may be held liable for malicious prosecution."); *Crespo v. New York City Police Commissioner*, 930 F.Supp. 109, 118 (S.D.N.Y.1996) ("Complaining witnesses are not entitled to immunity if they initiate a baseless prosecution ...."). Crediting Plaintiffs' version of events and drawing reasonable inferences in their favor, a reasonable fact-finder might conclude that the information provided in the Kings County Criminal Court Complaint (the "McKenzie Complaint") filed against

McKenzie concerning McKenzie's gesturing with his hand held like a gun was false, as McKenzie denies having made any such gesture. Accordingly, there is a triable issue, at least with regard to Rodriguez and Velasquez, the officers identified by name in the McKenzie Complaint, as to whether they procured or initiated McKenzie's prosecution on the basis of false information. *See Chimurenga*, 45 F.Supp.2d at 343.

Defendants have also failed to establish that they are entitled to judgment as a matter of law with regard to the third and fourth prongs of the malicious prosecution standard. In the absence of any briefing by Defendants on the issue of probable cause and given the dispute concerning whether McKenzie made any gestures with his hand resembling a gun, a triable issue exists as to whether probable cause was lacking for the prosecution initiated against McKenzie. "A conclusion that the lack of probable cause presents a jury question likewise suggests that the issue of actual malice cannot be resolved through summary judgment." *Rounseville v. Zahl*, 13 F.3d 625, 631 (2d Cir.1994). Accordingly, the existence of actual malice is also a triable issue precluding a grant of summary judgment on this claim.

### IV. The Fourteenth Amendment Claims Brought by McKenzie and Webster Are Dismissed

McKenzie has alleged that he was deprived of food and water while in the holding cell at the 67th Precinct and Webster has alleged that he was deprived of food and water as well as shoes and socks while he was held at the 67th Precinct. Both McKenzie and Webster have further alleged that they were handcuffed in a painful manner and subjected to abusive language. Even accepting these allegations as true,[4] Defendants argue that the allegations are insufficient to establish that the conditions in the holding cell at the 67th Precinct support a claim under the Due Process Clause of the Fourteenth Amendment.

■■■■■■ Since McKenzie and Webster were pre-trial detainees during the incident in question, the Due Process Clause of the Fourteenth Amendment governs their claims regarding the conditions of their confinement. *See Bell v. Wolfish*, 441 U.S. 520, 535–36, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Benjamin v. Fraser*, 343 F.3d 35, 49–50 (2d Cir.2003); *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir.1996). Under the Due Process Clause, government officials may subject a pretrial detainee to restrictions that are inherent to confinement in a detention facility so long as those conditions do not "amount to punishment of the detainee." *Bell*, 441 U.S. at 535, 99 S.Ct. 1861. Thus, "courts considering challenges by pretrial detainees must initially consider whether the challenged conditions are punitive." *Benjamin*, 343 F.3d at 50.

■■■■■ "Not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense." *Bell*, 441 U.S. at 537, 99 S.Ct. 1861. The issue is whether the disability is "imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538, 99

---

4. Defendants assert that Webster testified that he offered Lana, who was without shoes and socks, his own shoes and that he was deprived of doing so by employees at the 67th Precinct. In opposition. Plaintiffs have reiterated the claims made in the amended complaint but have not disputed Defendants characterization of the record. As Webster does not appear to have been deprived of his shoes and socks, his claim with regard to these items fails.

S.Ct. 1861. "Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'" *Id.* (quoting *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)). Thus,

> [I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Id.* at 539, 99 S.Ct. 1861 (internal footnote omitted).

■ Defendants argue that the failure to provide food and water to McKenzie and Webster for the few hours they were held at the 67th Precinct does not rise to the level of a constitutional violation. Although Defendants point to nothing on the record regarding the duration of McKenzie's and Webster's detention, Plaintiffs do not dispute Defendants' suggestion that the detention only lasted a short time. Nor do Plaintiffs allege that these conditions were imposed for the purpose of punishing McKenzie or Webster. Absent such an allegation or evidence supporting such a claim, a determination of the sufficiency of Plaintiffs' claim depends on whether there may have been a legitimate governmental purpose motivating the failure to provide food and water to McKenzie and Webster, and whether the failure to provide food and water was excessive in light of that purpose. *See Bell,* 441 U.S. at 538, 99 S.Ct. 1861; *Lareau v. Manson,* 651 F.2d 96, 103 (2d Cir.1981). There are legitimate governmental purposes that justify not feeding every detainee upon arrival at a police station, particularly those detainees who arrive at a police station in the early morning hours, as McKenzie and Webster appear to have done. Given the relatively brief duration of McKenzie's and Webster's sojourn at the 67th Precinct and the absence of allegations of either injury resulting from the lack of food or water or punitive intent, McKenzie's and Webster's alleged deprivation is insufficient as a matter of law.

■ Plaintiffs also allege that during their detention McKenzie and Webster were handcuffed in what they claim was a painful and twisted manner. As the Supreme Court has explained, "[r]estraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting . . . ." *Bell,* 441 U.S. at 540, 99 S.Ct. 1861; *accord Benjamin,* 343 F.3d at 50 ("Because restraint is always necessary in effectuating confinement, not every uncomfortable or disabling condition and restriction can be considered punitive."). Under the facts here, McKenzie's and Webster's allegation regarding the use of handcuffs does not rise to the level of a constitutional violation. *See, e.g., Sulkowska v. City of New York,* 129 F.Supp.2d 274, 292 (S.D.N.Y.2001) (concluding that the plaintiff's restraint by handcuffs which she alleged were tight and caused her hands to swell was merely an incident of her detention and did not rise to the level of punishment in violation of the Fourteenth Amendment).

Nor does McKenzie's and Webster's allegation that they were subjected to abusive language while in detention represent

a violation of constitutional dimension. Being subjected to verbally abusive language does not rise to the level of a constitutional claim in an Eighth Amendment context. *See, e.g., Rivera v. Goord,* 119 F.Supp.2d 327, 342 (S.D.N.Y.2000); *Brown v. Jacobson,* No. 98 Civ. 565(LBS), 1999 WL 1125122, at *5 (S.D.N.Y. Dec.8, 1999); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) (observing that "verbal harassment or profanity alone, un-accompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983") (citation and internal quotation marks omitted). As Plaintiffs have pointed to no caselaw or other rationale justifying a different conclusion in the context of a Fourteenth Amendment claim, the allegations of abusive language will not sustain a constitutional claim here.

### V. Summary Judgment on Plaintiffs' First Amendment Retaliation Claims Is Denied

Plaintiffs assert that in response to statements made by Mills, McKenzie and Webster to certain Defendants outside the Mills residence criticizing and questioning Defendants' actions, Defendants retaliated against them by forcefully throwing Mills against a car face first, chasing McKenzie inside the Mills residence, body-slamming and punching him, and handcuffing him excessively tight, and throwing Webster against a fence, forcefully bumping into Webster's chest, handcuffing him excessively tight, and yanking him and tossed him around by the tight handcuffs. Plaintiffs further assert that their criticisms of police were followed by statements of retaliatory animus by Defendants.

 To establish a *prima facie* case under the First Amendment for retalia-

tion, a plaintiff must establish that he or she engaged in conduct or speech that is protected by the First Amendment and that the defendant's actions were motivated by or substantially caused by the exercise of that right. *See Posr v. Court Officer Shield # 207,* 180 F.3d 409, 418 (2d Cir.1999) (citing *Gagliardi v. Village of Pawling,* 18 F.3d 188, 194 (2d Cir.1994)); *see also Curley v. Village of Suffern,* 268 F.3d 65, 73 (2d Cir.2001) (further requiring a plaintiff to show that the defendant's actions effectively chilled the exercise of the plaintiff's First Amendment right); *Kerman v. City of New York,* 261 F.3d 229, 242 (2d Cir.2001) (same) (citing *Connell v. Signoracci,* 153 F.3d 74, 79 (2d Cir.1998)). If the plaintiff has carried that burden, then the defendant must show by a preponderance of the evidence that the defendant's conduct would have been the same " 'even in the absence of the protected conduct.' " *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (quoting *Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). "Thus, if taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone." *Graham,* 89 F.3d at 79; *accord Davidson v. Chestnut,* 193 F.3d 144, 148–49 (2d Cir.1999) (per curiam).

 Defendants assert that Plaintiffs' statements to the police officers outside the Mills residence do not touch on a matter of public concern and, thus, cannot reasonably be construed as protected speech for First Amendment purposes. It is well established that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston v. Hill,* 482 U.S. 451, 461, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987); *see also Provost v. City of Newburgh,* 262 F.3d 146, 154 (2d Cir.2001)

(holding that the First Amendment protects virtually every complaint made by an arrestee to a police officer, so long as the arrestee's speech does not tend to incite an immediate breach of the peace); *Kerman*, 261 F.3d at 242 (observing that a citizen has a First Amendment "right to criticize the police without reprisal"). Plaintiffs' comments at issue here consisted of criticism of the police officers' actions and questions regarding what was being done to Lana and whether the police officers could properly issue a summons for drinking alcohol on private property. Such comments constitute protected speech, notwithstanding Defendants' arguments to the contrary.[5]

■ Defendants further assert that Plaintiffs cannot show that their speech was a motivating factor behind the actions taken against them. The close temporal proximity between Plaintiffs' comments and Defendants' adverse actions against Plaintiffs constitutes circumstantial evidence based on which a reasonable factfinder could infer that the actions at issue were in response to and motivated by Plaintiffs' protected speech. *Cf. Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.1995) (observing that the temporal proximity between an inmate's lawsuit and the disciplinary action taken against him "may serve as circumstantial evidence of retaliation"); *accord Bennett v. Goord*, 343 F.3d 133, 138 (2d Cir.2003). This proximity, taken together with the statements purportedly made by the police officers in response to McKenzie and Webster's comments,[6] is sufficient to raise an issue of fact for the jury.

If Plaintiffs had shown the requisite elements of a *prima facie* retaliation claim, Defendants would, nonetheless, be entitled to summary judgment if they could establish by a preponderance of the evidence that their conduct would have been the same even in the absence of Plaintiffs' protected speech. Defendants' suggestion that the weekend of the incident is a dangerous weekend for police officers who deal with continuous drinking and partying is inadequate to satisfy their burden here. Likewise, Defendants' unsubstantiated and conclusory suggestion that, "regardless of what they said, screamed, or shouted at the police, all three plaintiffs could have been arrested for disorderly conduct and interfering with governmental administration" (Def. Reply Mem. at 11; *see also* Def. Mem. at 24–25) fails to establish De-

---

**5.** Defendants' reliance on First Amendment cases involving non-verbal conduct is misplaced. (*See* Def. Mem. at 23–24) (citing *Texas v. Johnson*, 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (explaining which types of symbolic activities constitute expressive conduct for the purposes of First Amendment analysis); *Cabrol v. Town of Youngsville*, 106 F.3d 101, 109 (5th Cir.1997) (explaining when the First Amendment comes into play in a case involving a plaintiff's conduct in retaining certain chickens after being asked to relocate them from his residence's yard)). Similarly, Defendants' citation to *Riggs v. City of Pearland*, 177 F.R.D. 395 (S.D.Tex.1997) falls shy of the mark, as the only comment attributed to the plaintiff in *Riggs* was his request to police that he be permitted to explain his actions. Although certain of the comments attributed to Mills, McKenzie, and Webster were made in the form of questions, these comments were, even in such form, critical of the police officers' actions, unlike the request made in *Riggs*.

**6.** Plaintiffs assert that, in response to McKenzie's comment questioning why Lana was being arrested, one of the police officers stated in substance "Who has got the smart mouth." (*See* Bruzzese Decl., Exh. F, at 92.) Webster asserts that in response to his question regarding the propriety of arresting someone else, the officers, acting in concert, stated in substance "Who are you the fucking judge? Now, you are going to be locked up instead of him." (*See* Bruzzese Decl., Exh. H, at 198–203.)

fendants' entitlement to summary judgment. As Defendants have failed to establish by a preponderance of the evidence that their conduct would have been the same even in the absence of Plaintiffs' comments, summary judgment with regard to the First Amendment retaliation claims of Mills, McKenzie and Webster is denied.

## VI. The Individual Officers Are Not Entitled to Qualified Immunity on the Identified Claims

Defendants argue that the individual police officers named in this action are entitled to qualified immunity on those of Plaintiffs' claims brought pursuant to federal law because Plaintiffs cannot establish that their constitutional rights have been violated, and, even if they could, the individual police officers should be afforded qualified immunity because their conduct was objectively reasonable under the circumstances. At the very least, Defendants contend, there were exigent circumstances authorizing the individual officers' entry into the Mills residence and reasonable officers could disagree as to whether Plaintiffs' speech was protected and whether their conduct interfered with the police officer's official duties. According to Defendants, there was also arguable probable cause to arrest both McKenzie and Webster.

The doctrine of qualified immunity shields government officials from suits for damages arising from performance of their discretionary functions when, applying an objective standard, "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The threshold inquiry in considering an assertion of qualified immunity is whether a "constitutional right would have been violated were

the allegations established." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *see also Moore v. Vega*, 371 F.3d 110, 114 (2d Cir.2004); *Holcomb v. Lykens*, 337 F.3d 217, 220 (2d Cir.2003). If such a violation could be made out on a favorable view of the parties' submissions, then the government official seeking to establish qualified immunity may do so in one of two ways.

First, government officials "are immune from liability if their conduct does not violate 'clearly established' statutory or constitutional rights the existence of which a reasonable person would have known." *Moore*, 371 F.3d at 114 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir.2001)). "In other words, the unlawfulness of the officials' actions must be apparent to support a viable claim." *Id.* (citing *Townes v. City of New York*, 176 F.3d 138, 144 (2d Cir.1999)). This determination "must be undertaken in light of the specific context of the case, not as a broad general proposition ...." *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. In resolving whether a right is clearly established, only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant. *See Moore*, 371 F.3d at 114.

Second, government officials are entitled to immunity "if they can establish that it was objectively reasonable for them to believe their actions were lawful at the time." *Moore*, 371 F.3d at 114 (citing *Cerrone*, 246 F.3d at 199); *see also Robison*, 821 F.2d at 921 ("[E]ven if the contours of the plaintiff's federal rights and the official's permissible actions were clearly delineated at the time of the acts complained of, the defendant may enjoy qualified immunity if it was objectively reasonable for him to believe that his acts did not violate those rights."). Objective reasonableness is es-

tablished if "the only conclusion a reasonable jury could reach is that reasonable officers would disagree on the constitutionality" of the official's actions. *Cerrone*, 246 F.3d at 203. Government officials will enjoy immunity from liability " 'as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.' " *Moore*, 371 F.3d at 114–15 (quoting *Anderson*, 483 U.S. at 638, 107 S.Ct. 3034).

▮ Although factual disputes concerning the events underlying a constitutional claim will not necessarily preclude a finding of qualified immunity, *see, e.g., Washington Square Post No. 1212 Am. Legion v. Maduro*, 907 F.2d 1288, 1292 (2d Cir. 1990) (emphasizing that "the question of qualified immunity is separate from the merits of the underlying action" and construing the facts on a motion for summary judgment in the non-movant's favor in reaching a determination on qualified immunity), where "there are facts in dispute that are material to a determination of reasonableness, summary judgment on qualified immunity grounds is not appropriate." *McKelvie v. Cooper*, 190 F.3d 58, 63 (2d Cir.1999); *see also Mickle v. Morin*, 297 F.3d 114, 122 (2d Cir.2002) ("Where the circumstances are in dispute, and 'contrasting accounts ... present factual issues as to the degree of force actually employed and its reasonableness,' a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity" addressing an excessive force claim.) (quoting *Kerman*, 261 F.3d at 239); *Kerman*, 261 F.3d at 240 (" 'Summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness.' ") (quoting *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir.1999)); *Oliveira v. Mayer*, 23 F.3d 642, 649 (2d Cir.1994) (Though immunity "ordinarily

should be decided by the court, that is true only in those cases where the facts concerning the availability of the defense are undisputed; otherwise, jury consideration is normally required.") (internal quotation marks and citations omitted).

▮ Defendants do not dispute that Plaintiffs' asserted rights were clearly established as of August 31, 2002. With regard to Mills' claim of unlawful entry, disputed issues of fact concerning the existence of exigent circumstances remain, and render summary judgment on qualified immunity grounds inappropriate, since a finding that exigent circumstances were absent will weigh on the objective reasonableness of Defendants' entry into the Mills residence. Similarly, genuine issues of fact concerning the reasonableness of force employed by Defendants with respect to Mills and the necessity for such force preclude a conclusion that the police officers' conduct was objectively reasonable. *See Mickle*, 297 F.3d at 122.

▮ The individual police officers implicated by McKenzie's malicious prosecution claim are not entitled to qualified immunity as a matter of law, since factual disputes exist as to whether McKenzie made a gun-shaped gesture with his hand and, accordingly, whether probable cause existed for McKenzie's prosecution. *See Weyant*, 101 F.3d at 858 (holding that where police officers' version of facts is "sharply disputed, ... the matter of the officers' qualified immunity therefore cannot be resolved as a matter of law"). Nor, finally, are individual Defendants entitled to qualified immunity on Plaintiffs' First Amendment retaliation claims. As the Second Circuit has explained,

Where the specific intent of a defendant is an element of plaintiff's claim under clearly established law, and plaintiff has adduced sufficient evidence of that intent to defeat summary judgment, sum-

mary judgment on qualified immunity grounds is inappropriate. In the present case retaliatory intent is an element of plaintiff's claim, and we have already noted that plaintiff's evidence of retaliatory animus is sufficient to make defendants' motivation a triable issue of fact. Until that issue is resolved by a factfinder, therefore, the retaliation claim against defendant [police commissioner] cannot be dismissed on qualified immunity grounds.

*Mandell v. County of Suffolk,* 316 F.3d 368, 385 (2d Cir.2003); *see also Stein v. Janos,* 269 F.Supp.2d 256, 263 (S.D.N.Y. 2003) (declining to dismiss the plaintiff's claim on qualified immunity grounds where there was "a triable issue of fact as to whether retaliatory animus motivated defendants' conduct toward plaintiff").

### VII. Plaintiffs Have Failed to State a Claim Against the City of New York

■ In order to hold a municipality liable as a "person" within the meaning of 42 U.S.C. § 1983, a plaintiff must establish that the municipality was at fault for the constitutional injury he or she suffered, *see Oklahoma City v. Tuttle,* 471 U.S. 808, 810, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), in that the violation of the plaintiff's constitutional rights resulted from a municipal policy, custom or practice. *See Monell,* 436 U.S. at 694, 98 S.Ct. 2018; *Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir.1995). A plaintiff may satisfy the "policy, custom or practice" requirement in one of four ways. *See Moray v. City of Yonkers,* 924 F.Supp. 8, 12 (S.D.N.Y.1996). The plaintiff may allege the existence of (1) a formal policy officially endorsed by the municipality, *see Monell,* 436 U.S. at 690, 98 S.Ct. 2018; (2) actions taken by government officials responsible for establishing the municipal

policies that caused the particular deprivation in question, *see Pembaur v. City of Cincinnati,* 475 U.S. 469, 483–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality opinion); *Walker v. City of New York,* 974 F.2d 293, 296 (2d Cir.1992); (3) a practice so consistent and widespread that it constitutes a custom or usage sufficient to impute constructive knowledge of the practice to policymaking officials, *see Monell,* 436 U.S. at 690–91, 98 S.Ct. 2018; or (4) a failure by policymakers to train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees. *See City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). There must also be a causal link between the policy, custom or practice and the alleged injury in order to find liability against a municipality. *See Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983). "[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *DeCarlo v. Fry,* 141 F.3d 56, 61 (2d Cir.1998) (quoting *Ricciuti v. New York City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991)).

Plaintiffs' premise their *Monell* claim on two arguments. First, Plaintiffs assert that the City was aware of complaints filed with the NYPD and the New York City Civilian Complaint Review Board ("CCRB"), as well as of the NYPD's own observations, that the individual police officers involved in the incident at the Mills residence were unfit to be police officers and that it was highly likely that they would commit the acts alleged by Plaintiffs, and that the City nevertheless, failed to take corrective action. Second, Mills claims that the City was aware that there had been a substantial amount of complaints in recent years, to CCRB in particular, regarding the improper manner in which police officers enter and search pri-

vate residences. Defendants argue that Plaintiffs' claims are conclusory, speculative and unsupported by articulable facts in evidence and, accordingly, insufficient to establish a *Monell* claim.

As an initial matter, Plaintiffs argue that Defendants have not met their burden on the motion for summary judgment insofar as they have not supported their motion with anything other than the "conclusory assertion in its memorandum of law that plaintiffs have no evidence to prove their case." (Pl. Opp. Mem. at 25.) Contrary to Plaintiffs' suggestion, however, "the burden on the moving party may be discharged by showing—that is pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *PepsiCo, Inc. v. Coca–Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (internal quotation marks and citations omitted); *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995) ("In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."); *Gallo*, 22 F.3d at 1223–24 ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). "When the moving party meets this burden, the burden shifts to the nonmoving party to come forward with 'specific facts showing that there is a genuine issue for trial.'" *PepsiCo*, 315 F.3d at 105 (quoting Fed.R.Civ.P. 56(e)); *see generally Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548; *accord Nebraska v. Wyoming*, 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993). There is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

Plaintiffs cite to a number of cases standing for the proposition that, "where the movant fails to fulfill its initial burden of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, even if no opposing evidentiary matter is presented, for the non-movant is not required to rebut an insufficient showing." *Giannullo v. City of New York*, 322 F.3d 139, 140–41 (2d Cir.2003) (internal quotation marks and citations omitted); *see also St. Pierre v. Dyer*, 208 F.3d 394, 404 (2d Cir.2000) ("[I]f the motion for summary judgment is not made and supported as provided in Rule 56, the Rule does not impose on the party opposing summary judgment an obligation to come forward with affidavits or other admissible evidence of his own."); *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir.1994 same). These cases are distinguishable, however, as the Second Circuit recognized in *Giannullo*:

> [U]nder the doctrine of *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), a defendant may move for summary judgment on the ground that the plaintiff has failed to adduce any evidence of an element of plaintiff's claim, and if the plaintiff fails in response to contest this assertion or adduce such evidence, defendant, without more, will prevail.... [S]uch a situation is wholly distinguishable from the instant case where it is defendant who is affirmatively asserting that, as a result of a particular sequence of events, the police had sufficient collective knowledge to justify a facially defective arrest. Nothing in *Celotex*, or in Fed.R.Civ.P. 56, would justify a defendant in such a situation in simply asserting the fact of such a sequence, without any supporting evidence whatever, and claim thereby to have shifted the burden to the plaintiff of disproving it.

*Giannullo,* 322 F.3d at 141 n. 2. Defendants here have not affirmatively asserted the existence of a particular factual scenario in support of their motion for summary judgment on Plaintiffs' *Monell* claim but have, instead, sought to demonstrate that there is an absence of evidence to support Plaintiffs' claim by outlining the purported flaws in the factual basis for Plaintiffs' *Monell* claim. Accordingly, they have satisfied their burden on the instant motion, and Plaintiffs must now come forward with specific facts demonstrating that there is a genuine factual issue for trial.

In support of their argument that the City is liable under 42 U.S.C. § 1983, Plaintiffs cite to an article in the New York Times describing the entry of police officers into private residences and various complaints to the NYPD and CCRB that purportedly relate to the individual officer Defendants, none of which have been submitted to the Court although Plaintiffs have offered to do so upon the Court's request.[7] Notwithstanding Plaintiffs' offer, the motion for summary judgment must be decided on the record before the Court. *See Garside v. Osco Drug, Inc.,* 895 F.2d 46, 49 (1st Cir.1990) ("[A] mere promise to produce admissible evidence at trial does not suffice to thwart the summary judgment ax."); *Chandie v. Whelan,* 21 F.Supp.2d 170, 176 n. 4 (E.D.N.Y.1998) ("[M]otions for summary judgment must be decided on the record as it stands, not on a litigant's visions of what the facts may some day reveal.") (quoting *Roche v. John Hancock Mutual Life Ins. Co.,* 81 F.3d 249, 253 (1st Cir.1996)). The record in this case is barren of specific evidence demonstrating the existence of a municipal policy or custom such as would satisfy Plaintiffs' burden; accordingly, summary judgment on Plaintiffs' *Monell* claim is granted. As Plaintiffs note, however, Plaintiffs' common-law causes of action against the City proceeding on a theory of *respondeat superior* may proceed. *See, e.g., Raysor v. Port Auth. of N.Y. & N.J.,* 768 F.2d 34, 38 (2d Cir.1985) (dismissing Section 1983 claims under *Monell* but permitting state law claims based on the doctrine of *respondeat superior* to survive); *Greenfield v. City of New York,* No. 99 Civ. 2330(AJP), 2000 WL 124992, at *10 (S.D.N.Y. Feb.3, 2000) ("Although *respondeat superior* [does] not apply to the § 1983 claims, plaintiff's common-law causes of action may proceed on a theory of *respondeat superior*.") (internal quotation marks and citations omitted); *Wu v. City of New York,* 934 F.Supp. 581, 591–92 (S.D.N.Y. 1996) ("Although *respondeat superior* claims are barred against municipalities for § 1983 violations under *Monell,* such claims are available for violations of state law.").

### VIII. McKenzie's and Webster's Abuse of Process Claims Are Dismissed

In New York, a malicious abuse of process claim lies against a defendant "(1) employs regularly issued legal process to compel performance or forbearance of some act; (2) with intent to do harm with-

---

**7.** Plaintiffs have offered to produce "the CCRB report described in the New York Times on May 28, 2003 concerning the alarming increase in complaints about illegal police raids and searches. Plaintiffs will also submit portions from numerous depositions conducted in this district where NYPD officers illegally entered and searched citizens' home[s]. Plaintiffs will further show that the officers who conducted these illegal entries and searches were not retrained or disciplined by the NYPD.... Finally, plaintiffs will present the disciplinary and CCRB histories of some of the defendants. These records will show that some of the defendants have engaged in serious police misconduct in the past, but were still allowed to retain their weapons, authority and power to arrest." (Pl. Opp. Mem. at 28–29.)

out excuse or justification; (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Cook v. Sheldon,* 41 F.3d 73, 80 (2d Cir.1994) (citing *Curiano v. Suozzi,* 63 N.Y.2d 113, 116, 480 N.Y.S.2d 466, 468, 469 N.E.2d 1324, 1326 (1984); *Bd. of Educ. of Farmingdale v. Farmingdale Classroom Teachers Ass'n,* 38 N.Y.2d 397, 403, 380 N.Y.S.2d 635, 642, 343 N.E.2d 278, 282 (N.Y.1975)). "The gist of the action for abuse of process lies in the improper use of process after it is issued. To show that regularly issued process was perverted to the accomplishment of an improper purpose is enough." *Dean v. Kochendorfer,* 237 N.Y. 384, 390, 143 N.E. 229, 231 (N.Y.1924); *see also Parkin v. Cornell University, Inc.,* 78 N.Y.2d 523, 530, 577 N.Y.S.2d 227, 230, 583 N.E.2d 939, 943 (N.Y.1991) (observing that it remains unclear "whether this language [from *Dean* ] should be viewed as a strict and limiting definition of the tort or whether it is merely illustrative" and that "nothing in this Court's holdings would seem to preclude an abuse of process claim based on the issuance of the process itself").

Defendants argue that Plaintiffs' state law claim for abuse of process should be dismissed because Plaintiffs cannot satisfy both the second and third elements. Plaintiffs assert summary judgment is inappropriate given the existence of a factual dispute regarding whether McKenzie and Webster violated the law or were, as Plaintiffs' claim, subjected to evidence manufactured by Defendants.

 Notwithstanding the factual disputes identified by Plaintiffs, both McKenzie's and Webster's claims of abuse of process fail because Plaintiffs have not established the existence of the third element identified in *Cook.* Whatever Defendants' motivations in arresting McKenzie and Webster, under New York law "a malicious motive alone ... does not give rise to a cause of action" for abuse of process.

*Curiano,* 63 N.Y.2d at 117, 480 N.Y.S.2d at 468, 469 N.E.2d at 1326; *see also Hauser v. Bartow,* 273 N.Y. 370, 374, 7 N.E.2d 268, 269 (N.Y.1937) ("If [one] uses the process of the court for its proper purpose, though there is malice in his heart, there is no abuse of process."); *Butler v. Ratner,* 210 A.D.2d 691, 693, 619 N.Y.S.2d 871, 873 (N.Y.App. Div.3d Dep't 1994) ("[T]he falsity of [defendant's] allegations and the defendant's malicious motive in making them do not, of themselves, give rise to a cause of action for abuse of process."). "Abuse, therefore, lies not in the synthesis of proper purpose and suspect motive. Improper motive is only abuse when joined with improper purpose." *Chamberlain v. Lishansky,* 970 F.Supp. 118, 122 (N.D.N.Y.1997); *see also Hauser,* 273 N.Y. at 374, 7 N.E.2d at 269 ("Every one has a right to use the machinery of the law, and bad motive does not defeat that right. There must be a further act done outside the use of the process—a perversion of the process."). As Plaintiffs have not identified any collateral objective or improper purpose as distinct from any possible improper motive, summary judgment regarding McKenzie's and Webster's state-law claim for abuse of process is granted.

### Conclusion

For the reasons set forth above, Defendants' motion for summary judgment is granted insofar as the federal claims against the City, McKenzie's and Webster's Fourteenth Amendment claims concerning conditions of confinement, and McKenzie's and Webster's state law claims for abuse of process are dismissed, and is otherwise denied.

It is so ordered.